## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | **Chapter 11** |
| | § | |
| **Juniper Specialty Products LLC,** | § | |
| **SGCE LLC** | § | **CASE NO. 20-33109** |
| | § | **CASE NO. 20-33110** |
| **Debtors.** | § | (Jointly Administered) |

**EMERGENCY MOTION FOR ORDERS: (I) (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING FORM AND MANNER OF AUCTION AND SALE NOTICE; (C) APPROVING FORM AND MANNER OF NOTICE OF ASSUMPTION AND ASSINGMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) SCHEDULING HEARING ON APPROVAL OF SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; AND (II) (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; AND (B) APPROVING THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF <u>CONTRACTS AND LEASES IN CONNECTION THEREWITH</u>**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE OPPOSING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE A RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO**

**THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Juniper Specialty Products, LLC ("Juniper") and SGCE LLC ("SGCE," and collectively with Juniper, the "Debtors"), file this *Emergency Motion for Orders: (I) (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Debtors' Assets; (B) Approving Form and Manner of Auction and Sale Notice; (C) Approving Form and Manner of Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Scheduling Hearing on Approval of Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; and (II) (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; and (B) Approving the Debtors' Assumption and Assignment of Contracts and Leases in Connection Therewith* (the "Sale Motion"), and in support hereof, respectfully submits as follows:

## I.    JURISDICTION

1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Sale Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    EMERGENCY CONSIDERATION

2.    The Debtors request emergency consideration of this Motion. As set forth in this Motion, the Debtors are endeavoring to enact a relatively expedited solicitation, auction, and sale process which, while providing sufficient time for solicitation of and due diligence by prospective buyers of the assets which are to be sold by the Debtors, will minimize delays which would otherwise result in the unnecessary accrual of administrative expenses – resulting in optimal and

expedited recoveries to creditors in these cases.  Accordingly, the Debtors believe that emergency consideration of the instant Motion is appropriate, and that a failure to grant the Motion on an emergency basis would result in significant diminution to the Debtors' estates.

## II.    PROCEDURAL BACKGROUND

3.      On June 19, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), thereby commencing the above-styled Chapter 11 cases (the "Cases").

4.      The Debtors continue to operate their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner in this Case.  No Official Committee of Unsecured Creditors has been appointed in this Case.

## III.    FACTUAL BACKGROUND

### A.    Overview

5.      Juniper and SGCE are both organized as Delaware limited liability companies and are based in Pasadena, Texas, with Juniper having a development project (the "Plant") in Westlake, Louisiana. SGCE has developed, licensed in and packaged intellectual property with its developed engineering plans into solutions to be licensed to develop such Fischer-Tropsch plants. As part of its business model, SGCE partly owns and provides support to such developments. SGCE licensed its XTLH Solution™ to Juniper for the Plant, holds a 10% interest in Juniper and is both a supplier and service provider to Juniper. Juniper owns the Plant assets, such as real property, leases, equipment, and machinery, and has engaged in the detailed engineering and construction necessary to complete the Plant.  Once the Plant was constructed and operational, Juniper planned to use the

Plant to make liquid hydrocarbon products from natural gas through a Fischer-Tropsch process. Juniper would sell the Fischer-Tropsch diesel and naphtha and upgrade and/or sell the Fischer-Tropsch waxes. The Fischer-Tropsch waxes are ultra-high quality, pure and highly-desirable waxes used in a wide range of applications in adhesives, coatings, construction materials and consumer goods. More specifically, the completion of the development project in Westlake, Louisiana was poised to make Juniper the first U.S. manufacturer of fully refined Fischer-Tropsch waxes, offering specialty products directly to North American wax customers. SGCE planned to use its share of proceeds from the Plant, as well as spotlighting its success, for launching its next project.

6.      Unfortunately, this is not the first time the project in Westlake, Louisiana has experienced issues completing construction. A predecessor entity that owned the project filed for bankruptcy in April 2016, and the assets were sold to Juniper (then named "RD Juniper LLC") in late June 2016. Much like its predecessors who had spent the better part of a decade developing the project, Juniper found it required more funding than it anticipated to complete the Plant, in this case resulting from unexpected and substantial engineering and construction cost overruns and delays. Because SGCE was a supplier and service provider (as well as licensor) to Juniper, Juniper's financial problems have adversely impacted SGCE as well, placing SGCE in a similar, financially distressed position

7.      Although Juniper and SGCE had worked hard to continue developing the project over the last several years, it became evident in April/May 2019 that the project could not go forward without additional capital or financing. Because of the previous problems in executing the engineering and construction for the Plant, it became evident that the engineering would have to be completed to a more sufficiently detailed level to enable solicitation of one or more fixed cost

bids to finish construction of the Plant, in order to reduce uncertainty to a level necessary to obtain additional investment. To reduce costs, both SGCE and Juniper laid off all of their remaining employees in at the end of July 2019. A small group of ex-employees were hired as consultants by Juniper and given the opportunity to try to finish the engineering and secure additional investment to complete the Plant.  As such, Juniper has been actively pursuing investors as well as the sale of replaceable material equipment, inventory, and other operating assets to fund the additional engineering work.  Juniper initially pursued an out-of-court restructuring because it believed, after consulting with its legal and financial advisors, that this path would maximize recoveries to creditors.  To support these activities, during the fourth quarter of 2019 and first quarter of 2020, both SGCE and Juniper completed the disposition of certain equipment, materials and other operating assets to third parties in several separate transactions.  With the funds it received, Juniper has been able to complete two of three phases of the necessary engineering work and to begin the third phase.

8.     As part of this process, the Debtors engaged Jefferies LLC in May 2019 to help obtain additional capital, and Jefferies LLC attempted to do so in two primary processes thereafter. Despite these pursuits, however, Juniper and SGCE have been unable to locate additional financing or capital on an out-of-court basis.[1]  Once the COVID-19 virus reached the United States, the interest level by remaining investors dissipated quickly, citing more attractive investment opportunities now available in the markets. On-site due diligence was also disrupted by travel restrictions and uncertainty created by the effects of the pandemic.

---

[1] Potential investors cited concerns regarding a number of factors, including uncertainty regarding completion costs, the proposed recovery for equity investors, claims against Juniper and SGCE, and litigation by Juniper's construction contractor, Aptim Maintenance LLC ("Aptim").

**B.      Events Leading to the Debtors' Chapter 11 Filings**

9.      Because the Plant would use natural gas to produce synthetic hydrocarbon products which to some extent compete with petroleum-based products in the Westlake plant, they operate in a highly cyclical industry, which current events in the oil and gas industry and COVID-19 have only exacerbated.  The fall in the oil and gas prices created by Russia and OPEC's struggle for market share decreased demand for all naphtha and diesel, even before COVID-19 impacted demand. And although the global wax industry was growing at about 1.3% per year, this was a statistic from *before* COVID-19 reached the United States and impacted demand. If the demand impact of COVID-19 is temporary, however, the respective business models for Juniper and SGCE are still remarkably sound.

10.      While Juniper and SGCE have been attempting to obtain financing, their creditors have been demanding payment and placing Juniper and SGCE in arbitration and litigation, which the Debtors can ill afford. In August of 2019, Juniper was sued by its construction contractor, Aptim, for unpaid invoices relating to the construction in state court in Louisiana.  The dispute was moved into arbitration in Houston. Since January 2020, the dispute costs have been much higher than anticipated and began to consume funds that could have been used to finish the final phase of the engineering. One of Aptim's suppliers, which Aptim was obligated to pay under the construction contract, recently sued both Aptim and Juniper in state court in Louisiana.  SGCE's direct creditors have not yet sued SGCE, but SGCE was (improperly) added as a defendant on litigation for a debt owed by Juniper.

11.      Based on the lack of financing, lack of immediate injection of capital, and inability to defend themselves against creditors, Juniper and SGCE undertook aggressive actions to

downsize their operations. Since August 1, 2019, neither SGCE nor Juniper have any employees. SGCE has no paid personnel and Juniper currently has very limited personnel.

12.    Given the potentially significant number and amount of these possible claims, the costs associated with mounting a defense on multiple fronts across multiple jurisdictions, and Juniper and SGCE's current respective cash/assets compared to the size of the respective creditor pools, both Juniper and SGCE became increasingly concerned about their ability to manage these litigation and arbitration costs. This concern, after consulting with their advisors regarding all of their restructuring/liquidation options, led Juniper and SGCE's respective boards of directors to conclude that they should each undertake an orderly sale of their businesses in a joint Chapter 11 proceeding in order to continue to reduce costs and maximize value for their creditors, although Juniper and SGCE continue to examine other strategic options such as DIP/exit financing and other restructuring options on a dual track.  To this end, as part of their "first day" motions, Juniper and SGCE will be filing a motion for approval of bidding procedures—which seek to sell Juniper and SGCE's remaining assets and pay creditors their claims consistent with their priorities established by the Bankruptcy Code and pertinent state law.

**C.    The Debtors' Assets / Asset Classes**

| Asset Class | Description | Specific Itemization in APA |
|---|---|---|
| **Improvements** | The Debtors possess a commercial-scale Fischer-Tropsch plant in North America, whose purpose is the conversion of cost-advantaged US natural gas into high-quality waxes (as defined above, the "Plant," and collectively with all facilities, structures, and all other fixtures and facilities to the extent appurtenant to the Debtors' real property, the "Improvements Assets Class"). | **The Improvements Asset Class is specifically delineated in Exhibit A – Part 2 and Exhibit A – Part 10 of Exhibit F.** |

| Asset Class | Description | Specific Itemization in APA |
|---|---|---|
| **Real Property** | The Debtors possess various interests in real property, including but not limited to: (i) a fee simple interest as to the land on which the Plant is located; (ii) numerous permits, licenses, servitudes, easements, rights-of-way, surface fee interests, and other surface use agreements used in connection with the ownership or operation of the Plant; and (iii) various leases of real property including, among others, (a) a lease of real property in connection with an inter-Debtor support services agreement, (b) a lease for office and parking space, and (c) a laydown lease (collectively, the "Real Property Asset Class"). | **The Real Property Asset Class is specifically delineated in Exhibit A - Part 1, Exhibit A - Part 3, and Exhibit A - Part 9 of Exhibit F.** |
| **Personal Property** | The Debtors possess various inventory, equipment, vehicles and other personal property which is not attached to the Plant and includes, but is not limited to: (i) all finished goods, work in process and raw materials; (ii) equipment; (iii) vehicles; (iv) tubular goods; (v) machinery; (vi) rolling stock; (vii) construction materials; (viii) trade fixtures; (ix) supplies; (x) office furniture; (xi) tools; (xii) computer equipment; (xiii) applications; and (xiv) replacement parts (collectively, the "Personal Property Asset Class"). | **The Personal Property Asset Class is specifically delineated in Exhibit A - Part 4, Exhibit A - Part 7, Exhibit A - Part 8, Exhibit A - Part 11, Exhibit A - Part 13, Exhibit A - Part 15, and Exhibit A - Part 16 of Exhibit F.** |

| Asset Class | Description | Specific Itemization in APA |
|---|---|---|
| **Intellectual Property** | The Debtors possess legal rights, title or interest in the following intellectual property: (i) certain patents and applications for patents; (ii) certain copyrights, copyright registrations and copyright applications, and copyrightable; (iii) certain trade dress and trade names, logos, Internet addresses and domain names, trademarks, service marks and related registrations; (iv) certain inventions, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, and reseller / supplier lists; (v) certain computer software, firmware, development tools, algorithms, files, records, technical drawings and related documentation, data and manuals; (vi) certain databases and data collections; and (vii) various other intellectual property rights (collectively, the "Intellectual Property Asset Class," and collectively with the Real Property Asset Class, the Improvements Asset Class, and the Personal Property Asset Class, the "Asset Classes," and the assets comprising the entirety of the Asset Classes, the "Assets").[2] | **The Intellectual Property Asset Class is specifically delineated in Exhibit A - Part 6 and Exhibit A - Part 14 of Exhibit F.** |

[2] The Assets also include numerous executory contracts which in many instances impact and/or are a part of more than one Asset Class.  These contracts are specifically located in Exhibit A – Parts 5 and 12 of **Exhibit F**.

## IV.    SUMMARY OF RELIEF REQUESTED

13.    By this Sale Motion, the Debtors request the entry of two orders concerning the sale of the Assets.  First, to provide for the orderly sale of the Assets, the Debtors seek the immediate entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"): (i) approving the Debtors' proposed bidding and auction procedures which will underlie the sale and are attached hereto as **Exhibit B** (the "Sale Procedures"); (ii) approving the form and manner of the notice of the auction and sale hearing (the "Sale Notice") attached hereto as **Exhibit C**; and (iii) approving the form and manner of notice of the assumption and assignment of executory contracts and unexpired leases in connection with the sale (the "Assumption Notice") attached hereto as **Exhibit D**.   The Debtors believe that the procedures and notices proposed herein with respect to the sale of the Assets are the best way to maximize the value of its Assets for the Debtors' estates and their creditors.

14.    Second, following the entry of the Bidding Procedures Order, the solicitation of bids for the Assets according to the Sale Procedures, and auction (if applicable), the Debtors will request the entry of an order substantially in the form attached hereto as **Exhibit E** (the "Proposed Sale Order") approving the sale of each Asset Class free and clear of all liens, claims, encumbrances and other interests, and authorizing the assumption and assignment of necessary executory contracts and unexpired leases in connection therewith, in accordance with a purchase and sale agreement for each Asset Class substantially in the form attached hereto as **Exhibit F**. The Debtors request that the hearing on the sale (the "Sale Hearing") be conducted by the Bankruptcy Court on August 14, 2020, or on such other day as the Bankruptcy Court permits.

## V.      PROPOSED SALE AND BIDDING PROCEDURES[3]

15.      The Debtors propose to conduct the sale of each of the Asset Classes in accordance

with the Sale Procedures to ensure that the Debtors' estates realize maximum value for the Assets.

16.      The Debtors request that the Court approve the Sale Procedures, which are

summarized below and which are designed to encourage all entities to put their best bids forward

and to maximize the value of the Assets:

- **Notice of Auction and Sale Hearing**.  Within three (3) business days following the entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by first class mail, postage prepaid, to (i) all potential purchasers previously identified or solicited by the Debtors and/or their professionals prior to the commencement of and during the pendency of these Cases; (ii) all other potentially interested parties identified by the Debtors and/or their professionals (collectively, with the parties identified in (i) above, the "Potential Purchasers"); (iii) all counterparties to executory contracts and unexpired leases with the Debtors; (iv) the Office of the United States Trustee; (v) all applicable United States, state and local regulatory or taxing authorities, recording offices or any governmental entity which have a reasonably known interest in the relief requested; and (vi) all parties on the most current master service list.  In the event the Debtors receive one or more Qualified Bids (defined below) on the Assets, the Debtors may hold an auction (an "Auction") on **August 6, 2020 at 9:00 a.m.** (the "Auction Date") at the offices of Kilmer Crosby & Quadros PLLC, 712 Main St., Suite 1100, Houston, Texas 77002, or such other location as designated by the Debtors in a notice provided to all Qualified Bidders (defined below).  In light of the potential health risks posed by COVID-19, the Debtors shall have the option, at their discretion, to conduct the Auction by video conference.

- **Due Diligence Period**.  Any party interested in submitting a proposal or offer (a "Bid") for one or more Asset Classes and seeking to become a Qualified Bidder (defined below) may be granted access to due diligence, including confidential and non-public information relating to the Assets, as necessary to enable such potential bidder to evaluate the Assets and to facilitate the consideration of making a Bid, so long as that person provides to the Debtors: (i) a confidentiality agreement, acceptable to the Debtors, with Jefferies LLC, the financial advisor to the Debtors; (ii) financial and other information that allows the Debtors to make a reasonable determination as to such person's financial and other capabilities to consummate a purchase of one or more of the Asset Classes within the time frame set forth for closing of the sale transaction; and (iii) a written request for due diligence information.

---

[3] The Debtors explicitly reserve the right to alter the various dates and deadlines contained within the bidding and sale procedures as the Debtors or the Bankruptcy Court deem necessary.

- **Bid Deadline**.  Any party who has engaged in due diligence and who wishes to submit a Bid for consideration as a Qualified Bid must submit such Bid in writing to: (i) counsel to the Debtors, Kilmer Crosby & Quadros PLLC, c/o Brian Kilmer, 712 Main Street, Suite 1100, Houston, Texas  77002; and (ii) the Debtors' financial advisor, Jefferies LLC, c/o Matthew Hart,  mhart@jefferies.com so that it is received **on or before July 31, 2020 at 5:00 p.m. (CST)** (the "Bid Deadline").

- **Bids on Individual Asset Classes Permitted**.  Bids may be submitted on one, multiple, or all of the Asset Classes.  There is no requirement that a Bid be made solely for the entirety of the Assets.

- **Qualified Bids/Bidders**.  In order to constitute a Qualified Bid (as defined below), any Bid submitted by a bidder (each, a "Bidder") must: (i) be submitted to counsel for the Debtors on or prior to the Bid Deadline; (ii) not be conditioned upon financing or due diligence; (iii) contain signed "clean" versions of the purchase and sale agreement (each, a "Qualified APA") as to the relevant Asset Classes, with a "blackline" version reflecting how the purchase and sale agreement as to the Assets varies from the proposed purchase and sale agreement attached to this Sale Motion as **Exhibit F**; (iv) identify the consideration to be paid for the subject Assets, including any portion of the consideration that will be paid in cash and any portion of the consideration to be paid in any other form of cash-equivalent consideration; (v) be accompanied by a deposit equal to 10% of the amount of the Bid; (vi) identify, with particularity, whether it is an offer for all of the Assets and, if not, each and every Asset Class to be purchased; (vii) identify, with particularity and by each Asset Class, each and every executory contract and unexpired lease the Bidder intends to assume; (viii) be accompanied by evidence satisfactory to the Debtors that the Bidder is willing, authorized (including by such Bidder's board of directors or comparable governing body), capable and qualified financially, operationally, legally and otherwise, of unconditionally performing all obligations under the Qualified APA, including, without limitation, (a) all assumed obligations with respect to the relevant Assets, and (b) the ability to provide adequate assurance of future performance under contracts and leases to be assumed pursuant to section 365 of the Bankruptcy Code; (ix) provide that such Bidder's offer is irrevocable until the close of the sale of the respective Asset Classes if such Bidder is determined to be the Successful Bidder (as defined below), and that such Bidder agrees to serve as the Back-Up Bidder (as defined below) if not selected as the Successful Bidder; (x) fully disclose the identity of each entity that will be bidding in any Auction scheduled by the Debtors; and (xi) contain such other and further information as may be reasonably requested by the Debtors at least two (2) business days prior to the Bid Deadline.  A Bid which satisfies the requirements of (i) through (xi) directly above, as determined by the Debtors, shall constitute a "Qualified Bid" and the Bidder submitting such Qualified Bid shall constitute a "Qualified Bidder."

As soon as practicable after the Bid Deadline, the Debtors shall determine, in their sole discretion: (i) which timely submitted Bids constitute Qualified Bids, and (ii) the highest and otherwise best Qualified Bids for the Assets.  The Debtors shall notify each Qualified Bidder that such party is a Qualified Bidder as soon as practicable.

- **Auction**.  In the event the Debtors receive one or more Qualified Bids on an Asset Class, the Debtor shall hold the Auction as to that Asset Class on August 6, 2020 at 9:00 a.m. (CST) (the "Auction Date") at the offices of counsel to the Debtors, Kilmer Crosby & Quadros PLLC, 712 Main St., Ste. 1100, Houston, TX  77002, or such other location as designated by the Debtors in a notice to all Qualified Bidders. In light of the potential health risks posed by COVID-19, the Debtors shall have the option, at their discretion, to conduct the Auction by video conference.    The Auction shall be governed by the following procedures: (i) the Qualified Bidders shall appear in person at the Auction or through a duly authorized representative; (ii) only representatives of the Debtors, holders of Qualified Bids, and the US Trustee shall be entitled to be present at the Auction; (iii) a Qualified Bidder may propose a Qualified Bid on one, multiple, or all of the Asset Classes – there is no requirement that a Qualified Bid be made solely for the entirety of the Assets; (iv) only Qualified Bidders shall be entitled to make any subsequent Bids at the Auction; (v) each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale; (vi) bidding shall commence at the amount of the highest Qualified Bid(s) submitted by the Qualified Bidders prior to the Auction, as determined by the Debtors in their sole discretion, and shall be announced to all parties present at the Auction prior to the commencement of the Auction; (vii) Qualifying Bidders may then submit successive bids in increments of at least (a) as to the entirety of the Assets, 5% of the aggregate value to be the provided to the Estates by the originally selected highest and best bid as to the entirety of the Assets, (b) as to the Improvements Asset Class, 5% of the aggregate value to be provided to the Estates by the originally selected highest and best bid as to the Improvements Asset Class, (c) as to the Real Property Asset Class, 5% of the aggregate value to be provided to the Estates by the originally selected highest and best bid as to the Real Property Asset Class, (d) as to the Personal Property Asset Class, 5% of the aggregate value to be provided to the Estates by the originally selected highest and best bid as to the Personal Property Asset Class, and (e) as to the Intellectual Property Asset Class, 5% of the aggregate value to be provided to the Estates by the originally selected highest and best bid as to the Intellectual Property Asset Class; *provided, however*, that the Debtors may use their reasonable business judgment to increase or decrease the bidding increments at the Auction; (viii) the Auction shall continue until there is only one offer that the Debtors determine, and subject to Court approval, is the highest or best offer from among the Qualified Bids submitted at the Auction (the "Successful Bid," and the bidder submitting the Successful Bid, the "Successful Bidder") – in making this decision, the Debtors may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing

thereof, and the net benefit to the Debtors' estates; and (ix) bids made after the close of the Auction shall not be considered by the Debtors and the Auction shall not be re-opened.

- **No Qualified Bids**.  In the event the Debtors do not receive a Qualified Bid with respect to one or more Asset Classes, the Auction as to that Asset Class shall be cancelled, the Debtors shall report the same to the Court, and the Debtors shall promptly proceed to seek entry of the appropriate orders approving a sale of those Asset Classes which have received a Qualified Bid.

- **Preservation of Right to Cancel One or More Sales**.  If, after the conclusion of the Auction, the Debtors determine that one or more Successful Bids do not result in a sufficient realization of value to the Estates to justify their acceptance, the Debtors shall not be bound by the results of the Auction and shall have the right, in their sole discretion, to cancel any and all sales (and the Sale Hearing) as to one, some, or all of the Asset Classes.  The Debtors shall provide notice of such cancellation as soon as practicable to any relevant Successful Bidder.

- **Return of Deposits**.  Other than the deposits of the Successful Bidders and Back-Up Bidders, the Debtors shall return all deposits of unsuccessful bidders by no later than the 5th business day following the conclusion of the Auction.  A Qualified Bidder will forfeit its deposit if such Qualified Bidder is the Successful Bidder and: (i) it modifies or withdraws its bid without the consent of the Debtors, or (ii) materially breaches the terms and conditions of its Bid.

- **Back-up Bidder**.  If for any reason a Successful Bidder as to one or more Asset Classes fails to consummate the transactions contemplated by its Successful Bid and the order approving the sale, the Debtors may declare the next highest and best offer (the "Back-Up Bid," and the bidder submitting such Back-Up Bid, the "Back-Up Bidder") for the respective Asset Class(es) as the highest or otherwise best bid and seek to consummate the sale to the Back-Up Bidder on the terms set forth in the Back-Up Bid upon further approval by the Bankruptcy Court.

- **Sale Hearing**.  The Debtors shall seek approval of the sales of the Asset Classes to the Successful Bidders at a hearing before the Bankruptcy Court on August 14, 2020, or such date as the Bankruptcy Court is able to conduct the hearing (the "Sale Hearing").  The Sale Hearing may be continued on agreement of the Debtors and the Successful Bidders.  At the Sale Hearing, the Debtors will seek: (i) approval of the Successful Bids; (ii) authority to enter into definitive agreement(s) with respect to the Successful Bids and consummate the transactions contemplated by the Successful Bids; and (iii) entry of an order approving the sales.  A copy of the definitive agreement(s) with respect to the Successful Bid(s), as well as the proposed sale order in substantially final form, must be filed with the Bankruptcy Court at least 7 days prior to the Sale Hearing.  The deadline for objections to the sale shall be August 12, 2020 at 5:00 p.m. (CST).

- **Preservation of Rights to Institute Stalking Horse Bidder / Bid Protections**. While the Debtors do not currently have a stalking horse in place for the Assets, the Debtors explicitly reserve the right to institute a stalking horse and negotiate standard bid protections for said stalking horse.  In the event the Debtors reach an agreement with a third-party to be a stalking horse as to the Assets, the Debtors will amend this Sale Motion to request authority to institute the stalking horse and provide bid protections under terms approved by the Bankruptcy Court.

17.     The foregoing sale procedures are fair and transparent, and provide an appropriate framework to ensure the Debtors' goal of obtaining maximum value for the Assets.   The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the foregoing bidding procedures and the opportunity for competitive bidding embodied therein are reasonable and designed to maximize the value of the Assets and should, therefore, be approved by the Court.

## VI.      SALE OF ASSETS TO THE SUCCESSFUL BIDDERS

### A.      Sale of Assets is Product of Debtors' Reasonable Business Judgment

18.     Following the Bid Deadline and Auction, if any, the Debtors request the entry of an order substantially in the form of the Proposed Sale Order, attached hereto as **Exhibit E**, approving the sale of one or more of the respective Asset Classes free and clear of all liens, claims, encumbrances and other interests, and authorizing the assumption and assignment of executory contracts and unexpired leases in connection therewith.

19.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). "A sale of assets under § 363, as implemented by rule 6004, requires notice and a hearing and is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons." *Cadle Company v.*

*Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010).  In reviewing a proposed sale of assets, a bankruptcy court should give deference to the business judgment of a debtor in possession when it deems the sale to be appropriate.  *See Esposito v. Title Ins. Co. (In re Fernwood Mkts.)*, 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).  In evaluating such a sale, a court must balance the need for flexibility with the concern of affected creditors.  *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 715 (Bankr. W.D. Tex. 1989).

20.     The Debtors have determined, in the sound exercise of their business judgment, that a prompt sale of the Assets by auction presents the best opportunity to realize the maximum value of the Debtors' assets for distribution to creditors and is consistent with the Debtors' duty to orderly liquidate the Debtors' estates.  The Debtors submit that the results of the Auction will constitute the product of good faith, arm's length negotiations with respect to the price and other terms of the sale, and are the only available method of maximizing recoveries to creditors while minimizing administrative costs.

**B.      Sale of Assets Should be Free and Clear of Claims and Interests**

21.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  The Debtors submit that the free and clear sale of the Assets under these circumstances should be approved.  A sale free and clear of all claims and interests is necessary to maximize the value of the Assets.  A sale subject to claims and interests would result in a lower purchase price and be of substantially less benefit to the Debtors' estates.  A sale free and clear of liens is particularly appropriate under the circumstances because any lien in, to or against the Assets that exists immediately prior to the closing of any sale will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of liens, to the extent any exist, will be adequately protected by the availability of the proceeds of the sale to satisfy their liens.  Thus, the proposed sale satisfies section 363(f) of the Bankruptcy Code.  Moreover, any holder of a claim or interest that receives notice of the sale and who fails to object should be deemed to consent to the sale, thereby complying with section 362(f)(2) of the Bankruptcy Code.

**C.      Protections of Bankruptcy Code § 363(m)**

22.      Bankruptcy Code § 363(m) states, in relevant part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code "patently protects, from later modification on appeal, an authorized sale where the purchaser has acted in good faith and the sale was not stayed pending appeal." *In re Butan Valley, N.V.*, (slip op.), 2009 WL 6509349, at *4 (S.D. Tex. Sept. 11, 2009) (quoting *Matter of Gilchrist*, 891 F.2d 559, 560 (5th Cir. 1990)).  Where a commercially sophisticated seller and purchaser have negotiated a sale at arms-length, they have acted in good faith within the contemplation of section 363(m) of the Bankruptcy Code and are

entitled to the protections of that provision. *See In re Beach Dev., L.P.*, (slip op.), 2009 WL 3246771, at *3 (Bankr. S.D. Tex. Oct. 5, 2009).

23.     While the Bankruptcy Code does not define "good faith," "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pennsylvania, Inc.*, 7888 F.2d 143, 147 (3d Cir. 1986).  As the Debtors will demonstrate at the hearing on the Sale Motion, the Debtors shall have spent a considerable amount of time and resources negotiating the purchase and sale agreement at arm's length, with give and take on both sides.  Under these circumstances, this Court should find in the order approving the sale that the Successful Bidder is entitled to the protections of Bankruptcy Code section 363(m).

## VII.   SALE/AUCTION NOTICE

24.     Bankruptcy Rule 2002(a) provides, in relevant part, that all creditors must be given at least 21 days notice by mail of a proposed use, sale, or lease of property of the estate other than in the ordinary course of business.  Further, Bankruptcy Rule 2002(c) sets forth that such notices must include the time and place of any sale, the terms and conditions of such sale, and the time fixed for filing objections.

25.     The Sale Notice: (i) contains the type of information required under Bankruptcy Rule 2002; (ii) includes information concerning the Sale Procedures; and (iii) is reasonably calculated to provide due, adequate and timely notice to all interested parties of (a) the contemplated auction, (b) the contemplated sale, (c) the deadline to object to the sale, and (d) the

date of the Sale Hearing.  Accordingly, the Debtors would request Bankruptcy Court approval of the content of the Sale Notice.

26.     Within three (3) business days after the Court enters an order approving this Sale Motion, the Debtors shall serve a copy of the Sale Notice by U.S. First Class Mail to: (i) all potential purchasers previously identified or solicited by the Debtors and/or their professionals during this bankruptcy case; (ii) all other potentially interested parties identified by the Debtors and/or their professionals (collectively, with the parties identified in (i) above, the "Potential Purchasers"); (iii) the Office of the United States Trustee; (iv) all applicable United States, state and local regulatory or taxing authorities, recording offices or any governmental entity which have a reasonably known interest in the relief requested; and (v) all parties on the most current master service list.  Such notice constitutes adequate and sufficient notice of the Sale Notice.

## VIII.   ASSUMPTION/CURE NOTICE

27.     In accordance with Bankruptcy Rule 2002, the Debtors must provide notice of: (i) the potential assumption and assignment of executory contracts and unexpired leases (the "365 Contracts"); (ii) the maximum that the Debtors may pay to cure all defaults, if any, and to pay all losses that have resulted from defaults, under executory contracts and unexpired leases that the Debtors propose to assume and assign (collectively, the "Cure Amounts"); and (iii) the deadline to file objections to such assumption and assignment, the maximum Cure Amounts, and the existence of any defaults and/or adequate assurance of future performance.

28.     The Assumption Notice: (i) contains the type of information required under Bankruptcy Rule 2002 that is currently known to the Debtors; and (ii) is reasonably calculated to provide due, adequate and timely notice to all interested parties of (a) the potential assumption and assignment of executory contracts and unexpired leases, (b) the maximum amount offered to

satisfy the Cure Amounts, and (c) the deadline to file objections to such assumption and assignments, maximum Cure Amounts, and/or adequate assurance of future performance.

29.     Within seven (7) business days after the Court enters an order approving the Sale Motion, the Debtors shall serve a copy of the Assumption Notice by U.S. First Class Mail to: (i) the Potential Purchasers; (ii) all counterparties to executory contracts and unexpired leases with the Debtors; (iii) the Office of the United States Trustee; (iv) all applicable United States, state and local regulatory or taxing authorities, recording offices or any governmental entity which have a reasonably known interest in the relief requested; and (v) all parties on the most current master service list.  Such notice shall constitute adequate and sufficient notice of the Assumption Notice.

30.     The Debtors request that the following procedures be implemented with respect to the Sale Notice and Assumption Notice and relief related thereto:

i.      Objections, if any, to the sale and/or the proposed assumption and assignment of the 365 Contracts, including but not limited to any objections related to any Cure Amounts and/or adequate assurances of future performance must: (i) be in writing; (ii) state with specificity the nature of such objection; (iii) if concerning a Cure Amount, set forth a specific default in a 365 Contract and claim a specific monetary amount that differs from the Cure Amount (if any) specified by the Debtors in the Assumption Notice (with appropriate documentation in support thereof); (iv) comply with the Federal Rules of Bankruptcy Procedure; and (v) be filed with the Bankruptcy Court and served upon the following parties (collectively, the "Notice Parties") in accordance with the Federal Rules of Bankruptcy Procedure by August 12, 2020 at 5:00 p.m. (CST) (the "Objection Deadline").

- Counsel for the Debtors: Kilmer Crosby & Quadros PLLC, c/o Brian Kilmer, 712 Main Street, Suite 1100, Houston, Texas  77002

- Office of the United States Trustee, c/o Stephen Douglas Statham, 515 Rusk St, Suite 3516, Houston, TX 77002

ii.     The Debtors are authorized to amend the Assumption Notice by adding and/or deleting any 365 Contracts at any time prior to the Sale Hearing (by sending a new or amended Assumption Notice), and they shall use commercially reasonable efforts to effect the assumption and assignment of such 365 Contract in accordance with the Bankruptcy Code; *provided, however*, that counterparties to any 365 Contracts that are added to or deleted from the Assumption Notice shall have at

least five calendar days from service of the amended Assumption Notice to properly object to such addition/deletion.

iii.   Any person failing to timely file an objection to the sale shall be forever barred from objecting to the sale or the consummation thereof, including the vesting or transferring of the Debtors' assets free and clear of any and all liens, claims, and other interests, and will be deemed to consent to the sale.

iv.   Any person failing to timely file an objection to any Cure Amounts set forth in the Assumption Notice or the proposed assumption and assignment of the 365 Contracts shall be forever barred from objecting to the Cure Amounts and from asserting a claim for any cure or other amounts (or asserting that any defaults exist under the 365 Contract as of the date of assumption) against the Debtors, their estates, any purchaser of the Assets, or its respective successors and affiliates with respect to the 365 Contract arising prior to the assumption and assignment of the 365 Contract and will be deemed to consent to the proposed assumption and assignment of its 365 Contract.

v.   Where a counterparty to a 365 Contract timely files an objection asserting a higher cure amount than the maximum Cure Amount set forth in the Assumption Notice and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid with respect to such objection will be determined at the Sale Hearing or at such other date and time as may be set by the Bankruptcy Court.  All other objections to the proposed assumption and assignment of the 365 Contracts will be heard at the Sale Hearing.

vi.   If any person asserts that any property, other than an executory contract or an unexpired lease, cannot be transferred, vested, sold, and/or assumed and assigned free and clear of all liens, claims, and other interests, on account or one or more alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, or similar rights, then such person shall file and serve a notice (a "Rights Notice") so that the Rights Notice is actually received by the Notice Parties on or before the Objection Deadline.  Each Rights Notice must identify the property or properties that are subject to such alleged right, identify the type of right(s) claimed by such party, identify the agreement, document, or statute giving rise to such right, and identify the portion of the agreement, document, or statute giving rise to such right.

vii.   Any person failing to timely file and serve a Rights Notice shall be: (i) forever barred from objecting to the transfer, sale, vesting, assumption, and/or assignment of the properties, free and clear of all liens, claims and other interests, and from asserting any alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, or similar rights with respect to the Debtors' transfer, sale, and/or assumption of the properties; and (ii) deemed to consent to and approve of the transfer, sale, vesting, assumption and/or assignment of the properties, free and clear of all liens, claims and other interests.

**F.**     **The Stay Imposed Under Bankruptcy Rules 6004(h) and 6006(d) Should be Waived**

31.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that an "order authorizing the Debtors to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."  Fed. R. Bankr. P. 6006(d).

32.     A waiver of the 14-day stay periods provided by both Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d) will allow the Debtors, after approval by the Bankruptcy Court, to close the sale expeditiously, which, will minimize ongoing administrative costs.

## IX.     <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that this Court: (i) approve the immediately requested relief contained within the Sale Motion; (ii) schedule the Sale Hearing on August 14, 2020 (or as soon as practicable for Bankruptcy Court); and (iii) grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 22nd of June, 2020.

**KILMER CROSBY & QUADROS PLLC**

By:  */s/ Brian A. Kilmer*
Brian A. Kilmer
Texas Bar No.: 24012963
Email:  bkilmer@kcq-lawfirm.com
Meritt Crosby
Texas Bar No.: 24050462
Email:  mcrosby@kcq-lawfirm.com
Shannon A.S. Quadros
Texas Bar No.:24072766
Email: squadros@kcq-lawfirm.com
Stephen Risley
Texas Bar. No. 24099933
Email: srisley@kcq-lawfirm.com

712 Main St., Ste. 1100
Houston, TX  77002
Tel: 713.300.9662
Fax: 214.731.3117

**PROPOSED COUNSEL FOR DEBTORS**

## CERTIFICATE OF SERVICE

This is to certify that on June 22, 2020, a copy of the foregoing was served via ECF to all parties consenting to service of same, and to all below parties via U.S. First Class Mail or email.

*/s/ Brian A. Kilmer*
Brian Kilmer

## CERTIFICATE OF ACCURACY PURSUANT TO LOCAL RULE 9013-1(i)

In accordance with Local Bankruptcy Rule 9013-1(i), I hereby certify to the accuracy of the matters set forth in the foregoing Motion.

/s/ *Brian A. Kilmer*
Brian A. Kilmer