IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| **Juniper Specialty Products LLC,** | § | |
| **SGCE LLC** | § | CASE NO. 20-33109 |
| | § | CASE NO. 20-33110 |
| Debtors. | § | (Jointly Administered) |

### DECLARATION OF JOHN D. BAUMGARTNER IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, John D. Baumgartner, pursuant to 28 U.S.C. § 1746, do hereby declare (this "Declaration"), under penalty of perjury, that:

1. I serve as the Chief Restructuring Officer ("CRO") of Juniper Specialty Products LLC ("Juniper") and SGCE LLC ("SCGE," and collectively with Juniper, the "Debtors"), debtors and debtors-in-possession in the above-captioned cases (the "Chapter 11 Cases"). The Debtors are limited liability companies organized under the laws of Delaware and are located in Pasadena, Texas. I have served in my current capacity since June 2, 2020.

2. I am a Managing Director in the Disputes, Compliance & Investigations practice of Stout Risius Ross, LLC ("Stout") and lead the Houston practice. Stout is a global advisory firm specializing in investment banking, transaction advisory, valuation advisory, disputes, compliance, investigations, and management consulting. My offices are located at 1000 Main St., Suite 3200, Houston, TX 77002.

3. As CRO of the Debtors, I am responsible for, among other things, overseeing the operations and financial activities of the Debtors, including, but not limited to, monitoring cash flow, industry trends, liquidity, capital resources, business relationships, workforce issues and financial planning. In this capacity, since my retention I have been extensively involved in the

events leading up to the commencement of these Chapter 11 Cases. As CRO of the Debtors, I have detailed personal knowledge of, and experience with, the business and financial affairs, books and records, and employees of the Debtors and the industry in which they operate, and have accordingly supervised their businesses and financial affairs and have participated in strategic planning associated with their ongoing business decisions. As a result of my first-hand experience and knowledge, and through my review of the Debtors' books and records and other information, including discussions with management, consultants / former employees, advisors, and the Debtors' financial advisor and investment banker Jefferies LLC ("Jefferies"), I have formed opinions as to the necessity of obtaining the relief sought by the Debtors in their initial motions and applications (collectively, the "First Day Motions") to: (i) continue to operate effectively and manage their Chapter 11 Cases efficiently; and (ii) conduct an auction and sale process for all or substantially all of the Debtors' assets.

4. On June 19, 2020 (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") seeking relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). As described below, the Chapter 11 Cases have been commenced to undertake an orderly liquidation through a court-approved auction and sale of all or substantially all of the Debtors' assets.

5. I submit this declaration in support of the Petitions and the relief requested by the Debtors in the First Day Motions filed contemporaneously herewith, and to provide an overview of the Debtors and their current circumstances. I have reviewed the Petitions and the First Day Motions and believe that the relief sought therein is essential to ensure: (i) that the Debtors' business continues to operate in the ordinary course during the pendency of these Chapter 11 Cases; and (ii) that the auction and sale process contemplated within these Chapter 11 Cases is

conducted expeditiously and in such a manner as to maximize proceeds for distribution to the Debtors' creditor base.

6. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by consultants / former employees with responsibility for the relevant business and corporate matters addressed in the First Day Motions, information provided to me by the Debtors' professionals, or my opinion based upon experience, knowledge and information concerning the Debtors and the industry in which they operate. I am authorized to submit this declaration on behalf of the Debtors, and if called upon to testify, I would testify competently to the facts set forth herein.

7. Section I of this Declaration provides an overview of the Chapter 11 Cases. Section II provides background information on the Debtors' businesses, history and current circumstances, as well as the Chapter 11 Cases. Section III sets forth relevant facts in support of the First Day Motions.

## I. Overview

8. Juniper and SGCE are both organized as Delaware limited liability companies and are based in Pasadena, Texas, with Juniper having a development project (the "Plant") in Westlake, Louisiana. SGCE has developed, licensed in and packaged intellectual property with its developed engineering plans into solutions to be licensed to develop Fischer-Tropsch plants. As part of its business model, SGCE partly owns and provides support to such developments. SGCE licensed its XTLH Solution™ to Juniper for the Plant, holds a 10% interest in Juniper and is both a supplier and service provider to Juniper. Juniper owns the Plant assets, such as real property, leases, equipment, and machinery, and has engaged in the detailed engineering and construction necessary to complete the Plant. Once the Plant was constructed and operational, Juniper planned to use the

Plant to make liquid hydrocarbon products from natural gas through a Fischer-Tropsch process. Juniper would sell the Fischer-Tropsch diesel and naphtha and upgrade and/or sell the Fischer-Tropsch waxes. The Fischer-Tropsch waxes are ultra-high quality, pure and highly-desirable waxes used in a wide range of applications in adhesives, coatings, construction materials and consumer goods. More specifically, the completion of the development project in Westlake, Louisiana was poised to make Juniper the first U.S. manufacturer of fully refined Fischer-Tropsch waxes, offering specialty products directly to North American wax customers. SGCE planned to use its share of proceeds from the Plant, as well as spotlighting its success, for launching its next project.

9. Unfortunately, this is not the first time the project in Westlake, Louisiana has experienced issues completing construction. A predecessor entity that owned the project filed for bankruptcy in April 2016, and the assets were sold to Juniper (then named "RD Juniper LLC") in late June 2016. Much like its predecessors who had spent the better part of a decade developing the project, Juniper found it required more funding than it anticipated to complete the Plant, in this case resulting from unexpected and substantial engineering and construction cost overruns and delays. Because SGCE was a supplier and service provider (as well as licensor) to Juniper, Juniper's financial problems have adversely impacted SGCE as well, placing SGCE in a similar, financially distressed position

10. Although Juniper and SGCE had worked hard to continue developing the project over the last several years, it became evident in April/May 2019 that the project could not go forward without additional capital or financing. Because of the previous problems in executing the engineering and construction for the Plant, it became evident that the engineering would have to be completed to a more sufficiently detailed level to enable solicitation of one or more fixed cost

bids to finish construction of the Plant, in order to reduce uncertainty to a level necessary to obtain additional investment. To reduce costs, both SGCE and Juniper laid off all of their remaining employees in at the end of July 2019. A small group of ex-employees were hired as consultants by Juniper and given the opportunity to try to finish the engineering and secure additional investment to complete the Plant.  As such, Juniper has been actively pursuing investors as well as the sale of replaceable material equipment, inventory, and other operating assets to fund the additional engineering work.  Juniper initially pursued an out-of-court restructuring because it believed, after consulting with its legal and financial advisors, that this path would maximize recoveries to creditors.  To support these activities, during the fourth quarter of 2019 and first quarter of 2020, both SGCE and Juniper completed the disposition of certain equipment, materials and other operating assets to third parties in several separate transactions.  With the funds it received, Juniper has been able to complete two of three phases of the necessary engineering work and to begin the third phase.

11.	As part of this process, the Debtors engaged Jefferies LLC in May 2019 to help obtain additional capital, and Jefferies LLC attempted to do so in two primary processes thereafter. Despite these pursuits, however, Juniper and SGCE have been unable to locate additional financing or capital on an out-of-court basis.[1]  Once the COVID-19 virus reached the United States, the interest level by remaining investors dissipated quickly, citing more attractive investment opportunities now available in the markets. On-site due diligence was also disrupted by travel restrictions and uncertainty created by the effects of the pandemic.

## II.    Events Leading to the Debtors' Chapter 11 Filings

---

[1] Potential investors cited concerns regarding a number of factors, including uncertainty regarding completion costs, the proposed recovery for equity investors, claims against Juniper and SGCE, and litigation by Juniper's construction contractor, Aptim Maintenance LLC ("Aptim").

12. Because the Plant would use natural gas to produce synthetic hydrocarbon products which to some extent compete with petroleum-based products in the Westlake plant, they operate in a highly cyclical industry, which current events in the oil and gas industry and COVID-19 have only exacerbated. The fall in the oil and gas prices created by Russia and OPEC's struggle for market share decreased demand for all naphtha and diesel, even before COVID-19 impacted demand. And although the global wax industry was growing at about 1.3% per year, this was a statistic from *before* COVID-19 reached the United States and impacted demand. If the demand impact of COVID-19 is temporary, however, the respective business models for Juniper and SGCE are still remarkably sound.

13. While Juniper and SGCE have been attempting to obtain financing, their creditors have been demanding payment and placing Juniper and SGCE in arbitration and litigation, which the Debtors can ill afford. In August of 2019, Juniper was sued by its construction contractor, Aptim, for unpaid invoices relating to the construction in state court in Louisiana. The dispute was moved into arbitration in Houston. Since January 2020, the dispute costs have been much higher than anticipated and began to consume funds that could have been used to finish the final phase of the engineering. One of Aptim's suppliers, which Aptim was obligated to pay under the construction contract, recently sued both Aptim and Juniper in state court in Louisiana. SGCE's direct creditors have not yet sued SGCE, but SGCE was (improperly) added as a defendant on litigation for a debt owed by Juniper.

14. Based on the lack of financing, lack of immediate injection of capital, and inability to defend themselves against creditors, Juniper and SGCE undertook aggressive actions to downsize their operations. Since August 1, 2019, neither SGCE nor Juniper have any employees. SGCE has no paid personnel and Juniper currently has very limited personnel.

15. Given the potentially significant number and amount of these possible claims, the costs associated with mounting a defense on multiple fronts across multiple jurisdictions, and Juniper and SGCE's current respective cash/assets compared to the size of the respective creditor pools, both Juniper and SGCE became increasingly concerned about their ability to manage these litigation and arbitration costs. This concern, after consulting with their advisors regarding all of their restructuring/liquidation options, led Juniper and SGCE's respective boards of directors to conclude that they should each undertake an orderly sale of their businesses in a joint Chapter 11 proceeding in order to continue to reduce costs and maximize value for their creditors, although Juniper and SGCE continue to examine other strategic options such as DIP/exit financing and other restructuring options on a dual track. To this end, as part of the First Day Motions, Juniper and SGCE will be filing a motion for approval of bidding procedures—and seek to sell Juniper and SGCE's remaining assets and pay creditors their claims consistent with their priorities established by the Bankruptcy Code and pertinent state law.

### III. First Day Motions

16. As a result of my first-hand experience, and through my review of various materials and information, discussions with members of the Debtors' Board of Directors and discussions with the Debtors' professionals, I have formed opinions as to: (i) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below; and (ii) the immediate and irreparable harm to which the Debtors and recoveries to their creditors will be exposed unless the relief requested in the First Day Motions is granted without delay.

17. I submit this Declaration in support of the Petitions and the First Day Motions filed with the Court in these cases and as described below.

18.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct.  This representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

19.     The relief sought in the First Day Motions is critical to the success of these Chapter 11 Cases.  The First Day Motions will maximize value for the Debtors' estates and stakeholders by: (i) reducing unnecessary disruption and minimizing any adverse effects caused by these Chapter 11 Cases on the Debtors' businesses and operations; and (ii) providing an auction and sale process which will provide for an expeditious and efficient sale of the Debtors' assets which will maximize recoveries to the Debtors' creditors. As described more fully below, the Debtors, in consultation with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm during the pendency of the auction and sale process. For the reasons set forth below, I believe that the relief requested in each of the First Day Motions is appropriate under the circumstances and should be granted by the Court.

20.     ***Motion to Approve: (i) Bidding Procedures in Connection With Sale of Substantially All Assets, Form and Manner of Auction and Sale Notice, and Form and Manner of Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases; and (ii) Sale of Assets Free and Clear to Successful Bidder(s),.***  By this motion (the "Bidding Procedures Motion"), the Debtors request the entry of: (i) an order approving the Debtors' proposed bidding and auction procedures which will underlie the sale of substantially all of their

assets, the form and manner of the notice of the auction and sale hearing, and the form and manner of notice of the assumption and assignment of executory contracts and unexpired leases in connection with the sale; and (ii) upon completion of the bidding and auction process and the selection by the Debtors of highest and best bid(s) for the assets, an order approving the sale to the successful bidders free of all liens, claims, and other encumbrances.

21. The Debtors have determined, in the sound exercise of their business judgment, that a prompt sale of the Assets by auction presents the best opportunity to realize the maximum value of the Debtors' assets for distribution to creditors which is consistent with the Debtors' duty to orderly liquidate the Debtors' estates. I believe that the results of the Auction will constitute the product of good faith, arm's length negotiations with respect to the price and other terms of the sale, and are the only available method of maximizing recoveries to creditors while minimizing administrative costs.

22. The procedures and notices proposed by the Bidding Procedures Motion are the best way to maximize the value of the assets for the Debtors' estates and their creditors. In recognition of the Debtors' limited liquidity, the milestones proposed by the Bidding Procedures with regard to, among other items, the due diligence period, bid deadline, auction, and sale hearing are all designed to achieve an expeditious sale process which will minimize administrative expenses during the pendency of the solicitation, auction, and sale process – while at the same time providing sufficient time for due diligence by interested parties in order to properly expose the assets to market forces and maximize value to creditors. The relief requested by the Bidding Procedures Motion is accordingly appropriate under the circumstances.

23. ***Motion to Authorize Filing of a Consolidated List of Creditors and Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and***

***Other Information.*** By this motion, the Debtors seek entry of an order: (i) authorizing them to file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor; (ii) approving the form and manner of notifying creditors of the commencement of the chapter 11 cases and the scheduling of the meeting of creditors under section 341 of title 11 of the Bankruptcy Code; and (iii) granting other related relief.

24. Given the nature of the Debtors' business operations, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming and administratively burdensome; as such, utilizing a consolidated list of key creditors will help alleviate these burdens and costs, while reducing the possibility of duplicative service. Accordingly, the filing of a consolidated list of creditors and serving single notice of commencement will maximize efficiency and assist in an orderly transition into chapter 11.

25. ***Motion to Approve Continued Use of Cash Management System.*** By this motion the "Cash Management Motion"), the Debtors seek entry of an interim and final order: (i) authorizing the continued use of their existing cash management system, bank accounts, and business forms; (ii) authorizing the continued use of intercompany arrangements; and (iii) granting waiver of investment and deposit requirements under Section 345 of the Bankruptcy Code.

26. To lessen the impact of the chapter 11 filings on the Debtors' business, I believe it is vital that the Debtors keep their cash management system in place and be authorized to pay outstanding fees owed in relation to the Debtors' bank accounts, such as payments to third-party vendors whose services are critical for the uninterrupted operation of the cash management system. Any disruption to that system would severely impair the operations of the Debtors, hinder the

ability of parties to optimize business performance, and result in an overall detriment to all parties in interest.

27.     ***Motion for Authority to Continue Insurance and Pay Prepetition Claims***. By this motion (the "Insurance Motion"), the Debtors seek authority to continue their pre-petition insurance programs, to pay any pre-petition premiums and related obligations, and to renew insurance policies in the event that the policies should expire postpetition.  Maintaining the existing insurance programs is necessary to preserve the value of the estates and the Debtors' business.  Any lapse or disruption in insurance coverage could result in immediate and severe consequences for the business.  Absent sufficient and continuing insurance coverage, the Debtors may also be exposed to substantial liability and could suffer severe hindrance to their operations.

28.     Further, the Debtors believe they may need to make upcoming payments to the Carriers and the Broker, as defined in the Insurance Motion.  If the Debtors are unable to continue their ordinary business operations by continuing to pay the Carriers and the Broker as payments become due, and to reassure the Carriers and the Broker that authority has been granted to honor all such claims, the Debtors may suffer immediate and irreparable harm.

29.     ***Motion to Prohibit Utility Disconnection, Deem Utilities Adequately Assured of Future Performance, and Establishing Procedures for Determining Requests for Adequate Assurance***.  By this motion (the "Utilities Motion"), the Debtors seek an interim order: (i) prohibiting their utility providers from altering, refusing, or disconnecting services to the Debtors absent a further Bankruptcy Court order; (ii) deeming the Debtors' utility providers adequately assured of future payment; (iii) establishing procedures governing any additional request for adequate assurance; and (iv) scheduling a final hearing on the Utilities Motion within 30 days of the Petition Date.

30. Refusal and/or disconnection of service would cause overt harm to the Debtors' operations while they are in bankruptcy, and would cause profound harm to the Debtors' estates. Moreover, the adequate assurance deposits contemplated within the Utilities Motion provide sufficient adequate assurance to the Debtors' utility providers, the Utilities Motion provides the utility providers with an organized process to negotiate any adequate assurance which they deem insufficient and, in any event, the utility providers will have an opportunity to object to their adequate assurance prior to entry of a final order on the Utilities Motion. I accordingly believe that the relief requested by the Utilities Motion is appropriate under the circumstances.

## Conclusion

31. In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these Chapter 11 Cases, I respectfully submit that each of the First Day Motions should be granted in its entirety, together with such other and further relief as this Court deems just and proper.

## Certification

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

*/s/ John D. Baumgartner*
John D. Baumgartner
Chief Restructuring Officer