IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE<br><br>**Juniper Specialty Products LLC,**<br>**SGCE LLC**<br><br>    **Debtors.** | Chapter 11<br><br>CASE NO. 20-33109<br>CASE NO. 20-33110<br><br>(Jointly Administered) |

**APTIM MAINTENANCE, LLC'S (I) OMNIBUS
OBJECTION TO FIRST-DAY MOTIONS AND (II) REQUEST TO
ADJOURN THE BIDDING PROCEDURES MOTION**
[Relates to Docket Nos. 5, 6, 7, 13, 16 and 17]

The undersigned counsel, on behalf of secured creditor APTIM Maintenance, LLC ("APTIM"), files this *(I) Omnibus Objection to First-Day Motions and (II) Request to Adjourn the Bidding Procedures Motion* (the "Objection") in response to certain of the "first-day motions" filed in the above-styled jointly administered bankruptcy cases (collectively, the "Bankruptcy Cases") by the above-captioned debtors and debtors in possession (the "Debtors"). APTIM respectfully states as follows:

**PRELIMINARY STATEMENT**

1. APTIM is by far the largest creditor of Debtor Juniper Specialty Products LLC ("Juniper"), holding a statutory lien claim of almost $39 million that is secured by a lien on substantially all of the assets owned by Juniper. APTIM objects to the Debtors' requested first-day relief on the grounds that much of the relief is either not properly heard on an emergency basis, or in any event should be denied in its entirety.

2. The Debtors filed these Bankruptcy Cases, APTIM believes, in an attempt to avoid a pending discovery deadline in an arbitration between APTIM and Juniper. That arbitration has dragged on for 9 months, with Juniper attempting to use the costs and delay of the

arbitration proceeding as a tactic to delay paying APTIM or allowing APTIM to take its collateral. Now, in Chapter 11, the Debtors seek "emergency" relief to pay *de minimis* prepetition obligations, and also seek approval of an expedited sales process that is prejudicial to APTIM's right to bid for its collateral.

3. The Debtors have not shown, nor can they show, any likelihood of a successful reorganization. The Debtors have themselves admitted as much, seeking emergency hearing of the sales process on the grounds that it will avoid accruing administrative costs and alleging that a failure to run an expedited process "would result in significant diminution to the Debtors' estates." (Bidding Procedures Motion ¶ 2.) The Debtors have no proposed DIP financing, and, notwithstanding their desire to separately split their assets into different "Asset Classes" in the sales process, have failed to identify a stalking horse bid for any asset on terms acceptable to the Debtors. Having failed to execute any sale or refinancing out of court, and facing a deadline in their arbitration, the Debtors seek approval to run a highly expedited sale process with the purported intent of avoiding administrative costs, which is set to conclude only approximately forty (40) days after the proposed "emergency" hearing to approve the applicable bidding procedures.

4. The message from this timeline is clear: Juniper has fully played out a nearly year-long attempt to frustrate APTIM's right to receive either payment for the services it provided or its collateral. Now, rather than produce discovery in the arbitration that would undercut Juniper's attempts to stonewall APTIM, the Debtors seek to run an expedited sale process that does not provide standard mechanisms for a credit bid by APTIM for its collateral.[1] Absent a significant cash bid by a party intending to complete the Plant – which neither APTIM,

---

[1] Indeed, despite having asked the Debtors for a draft of any bidding procedures in the days leading up to the commencement of these Bankruptcy Cases, the Debtors did not share a draft of the bidding procedures or the proposed timeline with APTIM prior to their filing the Bidding Procedures Motion on Monday evening.

2

the Debtors, or the Debtors' owners appear to believe is likely to be forthcoming – the Debtors will run out of money and are rapidly headed towards administrative insolvency.

5. Meanwhile, the remainder of the Debtors' requested relief confirms that they have very few (if any) real operations. No motions have been filed to pay critical trade vendors or suppliers. The Debtors have admitted that they have very few (if any) employees, and no motion has been filed to pay employee claims. There has been no motion filed to pay taxes or any other operating liabilities.  Instead, the Debtors have filed three "operational" motions:

   a. A cash management motion, seeking authority to continue use of the Debtors' two-bank-account cash management system;

   b. A utilities motion, indicating that there is approximately $3,200 in prepetition utility exposure that is not subject to a security deposit; and

   c. An insurance motion, indicating that substantially all of the premiums for the insurance policies have been paid through the policy year and the Debtors have no outstanding claims.

6. These filings tell a clear story. The Debtors have, at best, *de minimis*, liquidity to fund these Bankruptcy Cases and are seeking, as quickly as possible, to sell their assets to the highest bidder. The proper forum for this process is not Chapter 11.  APTIM tried, for months prior to the petition date, to have this process conducted under a cost-effective state law dissolution or receivership proceeding that would allow the Debtors to sell assets, permit APTIM to credit bid for its collateral, and wind down the Debtors.  These efforts were rejected in favor of the present "emergency" attempt to jam Juniper's largest secured creditor into a prejudicial sale process.

7. APTIM believes that a viable alternative to the untenable Chapter 11 process

proposed by the Debtors is a liquidation under Chapter 7, and APTIM intends, in the coming days, to file a motion to convert these Chapter 11 Cases to a Chapter 7 process.

8. In the interim, APTIM asks this Court to grant only such relief as it determines may properly be granted on an emergency basis. That should not include any aspect of the Debtors' rushed sales process. Parties in interest should have some reasonable opportunity to test whether this process has any hope of success, and APTIM has already propounded discovery on the Debtors in this regard. APTIM reserves all rights to raise additional objections at the hearing.

## RELEVANT BACKGROUND

### A. The Westlake Plant and APTIM's Contract

9. Juniper is the owner of immovable property and improvements thereon located in Westlake, Louisiana (the "Property"). Juniper planned to convert a dormant methane reformer on the Property and perform other construction work to build a facility that would convert natural gas into high quality paraffinic waxes used in a variety of commercial applications, as well as zero-sulfur light and middle distillates used in transportation and chemical industries (the "Plant").

10. Juniper, as owner, contracted with APTIM, as general contractor, under a construction contract, dated February 2, 2018 (the "Contract"), wherein APTIM agreed to construct and complete the Plant. APTIM had no responsibility for design or engineering under the Contract. Pursuant to the Contract, it was Juniper's obligation to produce final and complete engineering plans for the Plant. Juniper contracted with ReCon Management Services, Inc. to perform all design work for the Plant. From the inception of APTIM's construction at the Plant, Juniper's on-site construction management team was continuously advised of the progress of construction schedules and forecasts that were emailed directly to the responsible Juniper

personnel. In furtherance of its obligations under the Contract, APTIM subcontracted with a number of subcontractors and suppliers to perform the work on the project. APTIM performed in accordance with the Contract and Juniper paid all of APTIM's invoices, in full except for retainage, through the invoice dated March 29, 2019.

### B.    Juniper's Nonpayment and APTIM's Statutory Lien

11.    APTIM has received no payment from Juniper in over a year. Specifically, APTIM has not been paid on any invoices issued after March 29, 2019. Yet Juniper waited until on or about May 21, 2019, before notifying APTIM to cease work under the Contract.[2] Juniper locked the construction gate, restricted APTIM's access to the site, and informed APTIM that it was stopping construction because it did not have funds to pay APTIM's outstanding invoices.

12.    APTIM is currently owed at least $38,872,988.71 (the "APTIM Claim").[3] As a general contractor, the APTIM Claim is secured by a "privilege" on Juniper's property pursuant to the Louisiana Private Works Act (La. R.S. 9:4801, *et seq.*) that was filed in the mortgage records of Calcasieu Parish, Louisiana.[4] On August 23, 2019, APTIM filed a lien enforcement suit in Calcasieu Parish (the "State Court Proceeding"), seeking the amounts it is owed under the

---

[2]    Plans and specifications for most of the work APTIM was to undertake were not available when construction commenced, and were in fact slowly rolled out by Juniper's engineer during construction. Yet Juniper's on-site construction management team instructed APTIM to begin work with incomplete plans. Over the course of the project, as Juniper continuously produced revised plans that modified the specifications set forth in earlier plans (pursuant to which, at Juniper's direction, work had already been completed), additional work had to be done, and prior work changed, to accommodate the revised plans and specifications. Even in May of 2019, when Juniper advised APTIM that it had run out of money, hundreds of necessary plans and specifications had not yet been delivered.

[3]    Pursuant to its Contract with Juniper, APTIM is also entitled to recover attorney fees. Under the Louisiana Private Works Act, APTIM is also entitled to recover the costs of filing the statement of claim and the interest due on the principal amount owed.

[4]    The Debtors do not dispute that the APTIM Claim is secured. APTIM is not listed on the Debtors' list of unsecured creditors. Moreover, APTIM believes that documents produced in discovery will show that the Debtors' attempts to raise DIP financing from third parties assumed that the APTIM Claim was valid in the full amount of almost $39 million.

outstanding invoices and recognition and enforcement of its liens on the project.[5]

### C. The Arbitration Proceeding

13. On September 12, 2019, APTIM also initiated an arbitration proceeding with the American Arbitration Association against Juniper in accordance with the terms of the Contract (the "Arbitration Proceeding").[6] The State Court Proceeding was stayed pending a final decision in the Arbitration Proceeding.

14. Over the past nine months, APTIM and Juniper have continued the Arbitration Proceeding. APTIM has defended its work and sought payment of its outstanding invoices, while disputing Juniper's specious counterclaims.[7] June 19 was the deadline in the Arbitration Proceeding by which Juniper was required to produce all documents related to any claims in the Arbitration Proceeding. The morning of June 18, Juniper's CRO relayed to APTIM's counsel that Juniper was "not in a position to fully comply" with the discovery deadline in the Arbitration Proceeding. Later that day, Juniper and SGCE commenced these Chapter 11 Cases.

### D. The Failed Prepetition Marketing Process

15. In the meantime, Debtors engaged Jefferies LLC in prepetition efforts to assist with locating additional financing or capital to complete the Plant. APTIM understands that the Debtors estimate that $200 million of additional capital is necessary to complete the project. Upon information and belief, the Debtors commenced these Bankruptcy Cases with just over $700,000 in cash, after having run an unsuccessful prepetition marketing process to raise

---

[5] Under Louisiana law, APTIM was required to institute the State Court Proceeding within one year of recording its lien in order to preserve its privilege on the Property. *See* La. R.S. 9:4823.

[6] Several of APTIM's subcontractors have also initiated litigation proceedings against APTIM and Juniper seeking the amounts they are owed for work performed on the project.

[7] Juniper provided no notice of any issues with APTIM's work or invoicing while the project was ongoing. In fact, Juniper did not articulate any issues with APTIM's work or invoicing until it filed responsive pleadings in the Arbitration Proceeding. To date, Juniper has failed to provide any factual details or documents supporting any real defects or deficiencies in the Work or in APTIM's invoices.

additional capital and/or sell the Plant. APTIM has served discovery on the Debtors in advance of this hearing seeking, among other things, to understand the extent of the prepetition marketing process and efforts to obtain DIP financing.

### E.  Commencement of the Bankruptcy Cases

16. Faced with a discovery deadline in the Arbitration Proceeding, the Debtors chose to commence these Chapter 11 Cases on June 18, 2020. The Juniper Debtor's principal asset is an incomplete, non-operational Plant. The Debtors have not filed an employee motion or a critical vendor motion, and have represented that no prepetition amounts are due to their insurance providers.

17. On Monday evening, June 22, 2020, the Debtors filed an "emergency" motion to establish bidding procedures and set a sale hearing for the middle of August. The Debtors seek to have the sale motion heard at the first-day hearing later today.

### OBJECTION TO "FIRST-DAY" MOTIONS

18. As noted above, APTIM does not believe that the Debtors have demonstrated that any of the requested relief needs to be heard on an "emergency" basis. Nevertheless, this Objection is filed to address APTIM's issues with the Debtors' requested relief and present certain revisions and additions to the forms of order presented with each "first-day" motion in the event that these matters are heard before APTIM's motion to convert these Chapter 11 Cases.[8]

> **A.  Emergency Motion for Orders: (I) (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Debtors' Assets; (B) Approving Form and Manner of Auction and Sale Notice; (C) Approving Form and Manner of Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Scheduling Hearing on Approval of**

---

[8] The proposed language changes set forth below have been discussed with counsel for the Debtors, and APTIM hopes that the Debtors will settle on agreeable language before the hearing on the first-day motions.

7

**Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; and (II) (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; and (B) Approving the Debtors' Assumption and Assignment of Contracts and Leases in Connection Therewith [Docket #13]**

19.     As an initial matter, APTIM objects to the Bidding Procedures Motion being heard on three-days' notice. Bankruptcy Local Rule 9013-1(i) requires that, to be heard on an emergency basis, the motion must "include a detailed statement why an emergency exists, and the date relief is needed to avoid the consequences of the emergency." *See also* Fed. R. Bankr. P. 6004(b) ("An objection to the proposed use, sale, or lease of property is governed by Rule 9014"); Fed. R. Bankr. P. 9014(a) ("In a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.").

20.     The Debtors' conclusory statements that they are "endeavoring to enact a relatively expedited solicitation, auction, and sale process" and that "a failure to grant the Motion on an emergency basis would result in significant diminution to the Debtors' estates" do not satisfy this burden. APTIM requests that the Court continue the hearing on the Bidding Procedures Motion to a date and time available to the Court. Additionally, APTIM submits that a full evidentiary hearing on the proposed sale and bid procedures is necessary to fully investigate the Debtors' business justification for a sale process in Chapter 11 (as opposed to Chapter 7), the Debtors' current liquidity position, the Debtors' valuation of the assets, as well as the prospects for a successful sale process.

21.     In addition, if this Court is inclined to hear and approve the Debtors' proposed sale process at today's first-day hearing (which APTIM believes is unnecessary and improper), APTIM ask that they be afforded the rights and protections of a secured creditor in a bankruptcy

sale process. APTIM requests and reserves all rights to raise additional objections at the hearing and to examine any Debtors' witnesses on all issues relating to the proposed bid procedures and sale process. Nevertheless, APTIM has reviewed the proposed Bidding Procedures and offers the following objections, subject to APTIM's right to supplement the objections to the extent the Debtors are not willing to include these changes. A redline reflecting APTIM's proposed changes to the Bidding Procedures is attached as Exhibit A.

- Credit Bid. APTIM, as secured creditor, should be permitted to credit bid the full amount of its claim in accordance with section 363(k) of the Bankruptcy Code. Both the Bankruptcy Code and applicable case law allows for a secured creditor to credit bid its secured claim and the proposed Bidding Procedures should reflect that credit bidding is permitted here. APTIM has proposed standard language to the proposed Bidding Procedures to clarify that APTIM has a right to credit bid, subject to section 363(k), and that every dollar of a credit bid shall be treated as the same as a dollar from a cash bid.
- Environmental Due Diligence. The Bidding Procedures note that a Qualified Bidder may be granted access to due diligence. It is unclear from the Bid Procedures whether such due diligence includes physical access to the Property. APTIM believes such clarity is necessary, especially to perform an updated environmental assessment. APTIM submits that having to seek relief from the stay to gain access to the Property is inefficient and unnecessary, especially in light of the Debtors' expedited sale process. For this reason, the proposed Bidding Procedures should allow for immediate access to the Property to perform such investigations during due diligence.
- Other Bid Requirements. The proposed Bidding Procedures require that a Qualified Bidder must submit a bid that includes a cash portion and be accompanied by a deposit equal to 10% of the amount of the bid. As discussed, APTIM should be permitted the ability to credit bid the full amount of its claim and not be required to submit any cash component in connection with a credit bid to obtain its collateral.
- Conduct of Auction. APTIM has proposed additional requirements with respect to the conduct of any Auction, including that each Qualified Bidder confirm on the record that it has no agreement with the Debtors or any other bidder to control the price, and that its Qualified Bid is a good faith offer and that it intends to close the proposed transaction if selected as the Successful Bidder. APTIM has also proposed that the Bidding Procedures provide that the Auction be conducted openly, in accordance with the Bidding Procedures, and that bidding at the Auction be transcribed.

22. For the foregoing reasons, APTIM respectfully requests that this Court sustain the

Objection, and either continue the hearing on the Bidding Procedures Motion to allow for an evidentiary hearing to be heard in connection with APTIM's forthcoming motion to convert these Chapter 11 Cases, or, in the alternative, sustain APTIM's Objection on the merits and revise the proposed Bidding Procedures and Bidding Procedures Order accordingly.

      **B.**      **Emergency Motion for an Interim and Final Order Pursuant to §§ 105, 345, 363, 364, 1107 and 1108 Authorizing (I) Continued Use of Existing Cash Management System, Bank Accounts, and Business Forms, (II) Continued Use of Intercompany Arrangements and (III) Granting Related Relief [Docket #5 and #17]**

      23.      The Debtors seek entry of interim and final orders to (i) maintain their bank accounts as debtor-in-possession accounts, (ii) use the bank accounts in accordance with the Cash Management System (as defined in the motion), (iii) continue performance of intercompany transactions and (iv) continue its current investment practices.

      24.      APTIM does not object to the Debtors' continued use of their bank accounts. APTIM does object to the extent that the Debtors seek to treat intercompany receivables and payables as administrative expenses superior to APTIM's lien. The motion requests that post-petition intercompany transactions be afforded administrative expense priority and the Debtors have not provided sufficient information about intercompany transactions and their repayment. Moreover, due to the risk of potential administrative insolvency of the Debtors, APTIM is concerned with respect to the administrative expense claims created as a result of post-petition intercompany transactions. To the extent that any of APTIM's collateral is used to pay such intercompany transactions, APTIM should not be required to bear the burden of funding intercompany transactions as administrative expenses of the estates.

      25.      In cases cited by the Debtors, the Court has ordered detailed description of intercompany transactions and restrictions on the amount of such transactions. The Debtors

proposed order does not include such restrictions or reporting requirements. APTIM also requests that language be added to the order clarifying that the order does not authorize the Debtors to advance any payment to a non-Debtor other than the payment of Debtor obligations to a non-Debtor in the ordinary course of business.

26. Based upon the foregoing objection, APTIM submits the following additional language to be included in the cash management order:

- Notwithstanding anything contained herein, the Debtors shall ensure that administrative claims are not created against Debtors that do not have sufficient cash to repay them. The Debtors shall provide APTIM and the United States Trustee with detailed documentation, records and reporting with respect to all Intercompany Transactions so that all transactions can be properly ascertained, traced and accounted for by providing a report on a weekly basis describing all transfers of cash constituting Intercompany Transactions. For the avoidance of doubt, this Order does not authorize the Debtors to undertake any Intercompany Transactions, or make any payment on any other obligations to a non-Debtor, that are inconsistent with the Debtors' operations in the ordinary course during the year before the Petition Date.

**C.     Emergency Motion for Authorization to: (i) Continue Pre-Petition Insurance Programs; and (ii) Pay Any Pre-Petition Premiums and Related Obligations [Docket #6]**

27. The Debtors seek entry of interim and final orders to make payments required to continue its insurance program, including payment of any pre-petition premiums and obligations, the payment of any audit adjustments concerning pre-petition premiums and obligations, and to continue post-petition its practice of paying brokerage fees and premiums to the brokers.

28. APTIM understands the Debtors' desire to maintain insurance during the pendency of these Bankruptcy Cases. Nonetheless, the Debtors state that they do not believe *any* prepetition amounts are due and owing, nor do they provide an estimate of any amounts owed for unpaid premiums or post-petition brokerage fees.

29. The motion states that the Debtors pay approximately $948,000 annually in premiums and that the premiums due for "most" of the policies have been paid in full for the

current policy year. The list of policies attached to the motion shows that most the policies are not set to expire until October 1, 2020 or later. The Debtors do not appear to have the liquidity to pay annual premiums when they come due, nor does the motion address what the Debtors plan to do in the event that insurance policies must be renewed during the pendency of these Bankruptcy Cases. The motion also does not describe any adjustments and whether such adjustments may be in the Debtors' favor. For instance, APTIM understands that the properties may be insured for a value much in excess of the Debtors' current estimate of property value. Further, the motion does not describe the fees to be paid to brokers and how such fees could benefit the estate, especially given that the Debtors are seeking the sale of all estate assets.

30. In summary, the Debtors have made no showing as to why the Insurance Motion needs to be heard on an emergency basis. Rather, the Debtors appear to be filing a customary motion rather than attempting to determine what policies actually make sense, whether adjustments can be made in the Debtors' favor and what fees should be paid.

31. APTIM questions whether an insurance motion is even necessary at this time if the policies are already in place and current. At a minimum, restrictions on the amount of payments that these Debtors should be permitted to make on insurance policies should be included in any proposed order, and these restrictions should be in accordance with the Debtors' available cash on hand.

    **D.**     **Emergency Motion for an Interim and Final Order to (1) Prohibit Utility Companies From Discontinuing, Altering or Refusing Service; (2) Deem Utility Companies Adequately Assured of Future Payment; and (3) Establish Procedures for Determining Requests for Additional Adequate Assurance [Docket #8 and #16]**

32. The Debtors seek entry of an order (i) prohibiting utilities from altering, refusing or discontinuing services to the Debtors absent any further order of this Court; (ii) deeming the

utility companies adequately assured of future payment; and (iii) establishing procedures for determining requests for additional adequate assurance.

33. The motion describes the proposed Adequate Assurance Deposit but the determination of such amount is not included in the proposed order. APTIM submits that the description the proposed Adequate Assurance Deposit amount should be included in the order. Further, it is not clear from the motion and attached exhibit the amount of Adequate Assurance Deposit the Debtors seek to make to the utilities. While the Debtors do have a column listing the "Average Monthly Cost," the description of the proposed deposit is an amount equal to one-half the monthly utilities payment. APTIM submits that the proposed order should make clear the amount of deposit being proposed.

34. The motion also describes that "average" monthly utility costs total approximately $45,300. APTIM submits that given the Debtors' limited liquidity and the fact that the Plant is not operational, utility deposits and monthly utility costs should be limited to the bare minimum.

35. The proposed order contemplates the addition of utility companies by the Debtor without further order of the Court, even outside the thirty (30) day period. *Compare* Docket # 20-10 ("'to the extent that any Utility Companies have been inadvertently omitted from the list of Utility Companies set forth on Exhibit A to the Motion, the Debtors [are] authorized to supplement that list without further order of the Court"), *with* Transcript of Hearing Held Feb. 4, 2020, *In re Am. Commercial Lines, Inc.*, Case No. 20-30982 (MI) (Bankr. S.D. Tex. Feb 14, 2020) at 66:9–11 ("I don't think I've ever allowed the addition of utilities outside that 30-day period and – nor do I think I can. And I always invite whoever you stick up here to tell me why I'm wrong about my reading of 366."). The proposed utilities order also provides the added utility company with thirty (30) days from the date of Supplemental Service to request the

Proposed Adequate Assurance Deposit. APTIM submits that the proposed order should make clear that it complies with section 366 and that no utility companies will be added outside the thirty (30) day period.

## RESERVATION OF RIGHTS

36. APTIM expressly reserves all rights, claims, arguments, defenses and remedies with respect to the relief requested at the first-day hearing, and further reserves its right to supplement, modify and amend this Objection, to seek discovery, and to raise additional objections and arguments in writing or orally at the hearing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE, APTIM respectfully requests that the Court (i) sustain this Objection and (ii) grant such other and further relief as may be just and proper.

Dated: June 25, 2020

Respectfully submitted,

**PHELPS DUNBAR LLP**

/s/Rick M. Shelby
Patrick "Rick" M. Shelby (La. Bar No. 31963)
(*Admitted in USDC, SDTX*)
Danielle Mashburn-Myrick
(*Admitted pro hac vice*)
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130
rick.shelby@phelps.com
danielle.mashburn-myrick@phelps.com

-and-

Ron E. Meisler
(*Application for pro hac vice Admission [Pending]*)
Carl T. Tullson
(*Admitted pro hac vice*)
Amy Van Gelder
(*Application for pro hac vice Admission Pending*)
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Facsimile: (302) 651-3001
Email:Carl.Tullson@skadden.com

**COUNSEL FOR APTIM MAINTENANCE, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2020, a true and correct copy of the foregoing Omnibus Objection to First-Day Motions and Request to Adjourn the Bidding Procedures Motion was served electronically via the Court's CMECF system.

*/s/Rick M. Shelby*