**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| IN RE | Chapter 11 |
| **Juniper Specialty Products LLC,**<br>**SGCE LLC** | **CASE NO. 20-33109**<br>**CASE NO. 20-33110** |
| **Debtors.** | **(Jointly Administered)** |

**APTIM MAINTENANCE, LLC'S (I) EMERGENCY MOTION FOR
CONVERSION OF THE DEBTORS' PENDING CHAPTER 11 CASES TO CASES
UNDER CHAPTER 7 AND (II) RESPONSE TO DEBTORS' PURPORTED
<u>NOTICE OF WITHDRAWAL OF EMERGENCY SALE MOTION</u>
[Relates to Docket Nos. 13, 28, 62 and 72]**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

The undersigned counsel, on behalf of secured creditor APTIM Maintenance, LLC ("APTIM"),[1] files this *(I) Emergency Motion for the Conversion of Debtors' Pending Chapter 11 Cases to Cases Under Chapter 7 And (II) Response to the Debtors' Notice of Withdrawal of Sale Motion* (this "Motion to Convert") to convert these Chapter 11 cases (collectively, the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (the "Debtors") to Chapter 7.  In support of this Motion to Convert, APTIM respectfully states as follows:

## PRELIMINARY STATEMENT

1.      At the outset of these Chapter 11 Cases, in the Omnibus Objection, APTIM argued that the purpose of the Debtors' initiation of these Chapter 11 Cases, and pursuit of their proposed fire sale strategy, was to forestall APTIM's rights as a secured creditor. The Debtors' actions during these Chapter 11 Cases have proven APTIM's arguments to be true. The Debtors appear fully committed to pursuing a sale process that eviscerates the rights of creditors and provides no guidance to potential bidders, all in the hope that their equity holders will receive a windfall.  Indeed, the Debtors' 11th hour purported withdrawal of the sale Motion, together with the Debtors' schedules and statements, make clear that these Debtors are being mismanaged and that this process is run for the benefit of the Debtors' insiders—to the detriment of APTIM, the Debtors' largest secured creditor, and APTIM's subcontractors and suppliers to the Juniper project.

2.      This blatant attempt to forestall creditors for the potential benefit of equity holders is directly contrary to the policy of the Bankruptcy Code.  Bankruptcy itself is an equitable

---

[1]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in *APTIM Maintenance LLC's (I) Omnibus Objection to First-Day Motions and (II) Request to Adjourn the Bidding Procedures Motion* [Docket No. 28] (the "Omnibus Objection"). The factual background and APTIM's objection to the Motion set forth in the Omnibus Objection and *APTIM Maintenance, LLC's Supplemental Objection to Bidding Procedures Motion* [Docket No. 62] (the "Supplemental Objection") are incorporated in their entirety by reference herein.

remedy that incorporates a standard of good faith for both the commencement and prosecution of bankruptcy proceedings.   *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071-72 (5th Cir. 1986). The requirement of good faith "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes."  *Id.* at 1072.  As set forth below, the facts of these Bankruptcy Cases warrant conversion to Chapter 7, and directly reflect the conduct against which the Fifth Circuit sought to protect in its *Little Creek* opinion.

3.     Shortly after commencing the Chapter 11 Cases, the Debtors filed an emergency motion (the "Motion") seeking emergency approval of (i) the sale of their assets and (ii) a timeline and set of procedures governing the sale (the "Bidding Procedures"), stating that "failure to grant the Motion on an emergency basis would result in significant diminution to the Debtors' estates." (Mot. ¶ 2.).  The Motion was not granted at the first-day hearing, in part, because the Debtors' proposed Bidding Procedures failed to preserve the rights of secured creditors to credit bid. The Court recognized this was problematic and continued the hearing on the Motion to July 6, instructing the Debtors to both engage in negotiations with APTIM regarding the extent of APTIM's "allowed credit bid" (*See* Tr. First-Day Hr'g 10:7) and to develop a set of procedures that protect credit bidding rights.

4.     Since filing the Motion, the Debtors have refused to meaningfully engage with APTIM, providing only one proposed term sheet that was a step backwards from prepetition negotiations.  In other words, although the Debtors represented to the Court that the bidding process must be quickly resolved to preserve value, their actions reveal that the Debtors do not have clean hands as they are now forestalling an orderly, Court-approved process for the disposition of assets to satisfy creditors.

5.     In its Supplemental Objection filed on July 3, 2020, APTIM asked the Court to approve changes to the Bidding Procedures that would protect the statutory rights of APTIM (as well as every other secured creditor) to credit bid in any sale of assets and to enter a scheduling order governing any disputes as to APTIM's proof of claim.  After over a week of the Debtors' refusal to respond to APTIM's proposed comments to the Bidding Procedures, early on the morning of July 5, 2020, the Debtors purported to simply withdraw the contested Motion.[2]  As an initial matter, this purported withdrawal of a contested matter without leave of the Court is improper.[3]

6.     But, even more troubling, during the depositions APTIM had scheduled for July 5, 2020, the Debtors' Chief Restructuring Officer (the "CRO") testified that even though the Debtors purported to withdraw the Motion, the Debtors intend to simply run the same sale process, on the same timeline, *without any procedures approved by this Court*.

7.     Adding to APTIM's significant concerns regarding the Debtors' ability to serve as responsible stewards of their estates, the Debtors' schedules and statements show that, in the year preceding the Petition Date (a period during which the Debtors had suspended construction of

---

[2]     This filing was made mere minutes before APTIM's properly noticed depositions on the Motion were set to begin.

[3]     Once APTIM filed its Omnibus Objection, a contested matter governed by Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") Rule 9014 was created.  *See* Fed. R. Bankr. P. 6004(b) ("An objection to the proposed use, sale, or lease of property is governed by Rule 9014.").  Courts have denied attempts to unilaterally withdraw contested motions.  *See, e.g.*, *In re Mocella*, 540 B.R. 342, 344 (N.D. Ohio 2015) (denying unilateral withdraw of motion pursuant to Bankruptcy Rules 7041 and 9014 and Federal Rules of Civil Procedure ("FRCP") Rule 41 because (1) the motion had been objected to, (2) there was no indication that the party opposing the motion would stipulate to withdraw of the motion, and (3) the motion was withdrawn the day before it was to be heard).  And contrary to the Debtors' attempt to withdraw the Motion, APTIM's objections mean that the Debtors need Court approval to withdraw their Motion.  *See, e.g.*, Fed. R. Civ. Pro. 41(a)(2) ("[A]n action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."); *see also* Fed. R. Bankr. P. 9014(c) (making Bankruptcy Rule 7041 applicable to contested matters); *In re Wotkyns*, 274 B.R. 690, 693 (S.D. Tex. 2002) (applying Rule 41 to a contested matter and stating that "after a response has been filed an objection to claim cannot be withdrawn without order of the court and upon such terms and conditions as the court deems proper").

the Plant and refused to pay amounts contractually owed to APTIM), Juniper paid roughly $4.2

million to insiders. *Statement of Financial Affairs for Non-Individual,* at item 4 [Docket No. 67].

By way of comparison, in the 90 days prior to the Petition Date, the Debtors paid approximately

$1.1 million to non-insiders and, during the same period, paid roughly $915,000 to insiders. *Id.*

at item 3.   Indeed, on information and belief, in the twelve months leading up to the Petition

Date, the Debtors sold assets while insolvent and have used the proceeds from these sales to

make preferential and/or fraudulent transfers to insiders.

8.      This course of events makes plain three conclusions:

- *First*, the Debtors have purported to withdraw their Motion, not because they are abandoning the sale process or believe that the pursuit of the sale of substantially all of their assets is an ordinary course activity, but because they do not wish to continue to subject their requested relief to Court scrutiny. This purported withdrawal is procedurally improper and is nothing more than a naked attempt to evade statutory credit bid rights and this Court's supervision of these debtors in possession.

- *Second*, the Debtors' withdrawal of the Motion leads to the conclusion that one of two things must be true. Either the Motion never represented a true emergency, and the Debtors' representations to this Court to that end were knowingly false; or, the Debtors' statements regarding the urgency of the Motion are true, and the Debtors are willing to take actions that, by their own admission, "would result in significant diminution to the Debtors' estates" by running a sale process without any Court approval or supervision.

- *Third,* a trustee should be appointed to investigate potentially valuable causes of action against the Debtors' insiders and other creditors, to preserve value for the benefit of the Debtors' estates and all creditors.

9.      Moreover, the Debtors' latest ploy has been to object to APTIM's claim earlier

this morning, purporting to reserve the right to supplement its objection on July 20 with a 30-

page brief.   Then, the Debtors propose that APTIM would have three days to file a reply.

APTIM does not agree with this approach, which is the latest in the Debtors' growing litany of

abuse of the bankruptcy process in an attempt to run an unsupervised sales process where APTIM's right to credit bid for its collateral is not preserved.

10.     Given the clear gamesmanship employed by the Debtors in the Chapter 11 Cases,[4] APTIM submits that the Debtors' management has proven itself incapable of administering the Debtors' estates.  Without a transparent, Court-approved process, it is doubtful that the Debtors would employ procedures that are likely to maximize the return for the estate.  When a debtor in possession violates the fiduciary duty owed to creditors "by failing to comply with fundamental requirements of the Bankruptcy Code and Bankruptcy Rules, conversion is an appropriate vehicle for stopping such conduct."  *In re Gow Ming Chao*, No. 11-38131, 2011 WL 5855276, at *4 (Bankr. S.D. Tex. Nov. 21, 2011).

11.     Accordingly, cause exists for the conversion of these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.[5]  To date, the Debtors have (i) sought to run a sales process without affording secured creditors the right to credit bid for their collateral, (ii) attempted to withdraw a contested matter without seeking leave of the Court, even after the

---

[4]   Already, in the short time since these Chapter 11 Cases began, the Debtors have made clear their willingness to improperly exploit procedural tactics.  Indeed, prior to withdrawing the Motion, the Debtors had first sought, improperly, to unilaterally adjourn the hearing on the Motion scheduled for July 6, 2020.  *See Docket Entry Dated June 2, 2020* ("*Certificate of Notice.* Case Manager contacted by Stephen Risley, Carl Tullson, and Brian Kilmer. Given the apparent dispute regarding whether the changed date for the hearing is agreed, *parties should seek relief from the Court by motion. The hearing remains on the docket as previously scheduled, pending consideration of any such motion.*") (emphasis added).

[5]   Cause also exists to appoint a trustee pursuant to 11 U.S.C. § 1104(a).  *See, e.g.*, *In re Cajun Elec. Power Coop., Inc.*, 191 B.R. 659, 661 (M.D. La. 1995), *aff'd* 74 F.3d 599 (5th Cir. 1996).  Section 1104(a)(1) of the Bankruptcy Code provides for the mandatory appointment of a trustee where "cause" exists.  11 U.S.C. § 1104(a)(1).  Additionally, section 1104(a)(2) of the Bankruptcy Code affords the Court a flexible standard whereby, without regard to statutory "cause," the Court has discretion to appoint a trustee when such appointment is in the best interests of the parties.  11 U.S.C. § 1104(a)(2).  But where the circumstances of the Chapter 11 Cases render the appointment of a Chapter 11 trustee an ineffective remedy (for example, here the Debtors have been unable to obtain postpetition funding on commercially reasonable terms, appear to be hurtling towards administratively insolvency, have represented that the failure to expeditiously obtain approval of the Motion will result in substantial diminution of the estates, and have no reasonable likelihood of rehabilitation), the interests of creditors and the estates will best be served by the conversion of these Chapter 11 Cases to a liquidation under Chapter 7.  *See* 11 U.S.C. § 1112(b)(1).

Court cautioned that any request for adjournment was to be made by motion, and (iii) informed APTIM that, notwithstanding the purported withdrawal of the Motion, the Debtors intend to simply run the sales process without Court approval.

12.     These acts do not comply with the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules, and are not in the best interest of creditors.[6]  Prompt conversion of these Chapter 11 Cases to Chapter 7 will "prevent a bad-faith or incompetent debtor-in-possession from  dissipating  property of the estate by having a Chapter 7 trustee take control of this property in order to liquidate the property so as to maximize distribution to creditors of the estate," *In re Gow Ming Chao*, 2011 WL 5855276, at *4, and will also satisfy one of the "twin pillars" of bankruptcy—satisfaction of allowed claims. *See In re Sissom*, 366 B.R. 677, 708 (Bankr. S.D. Tex. 2007).

## RELIEF REQUESTED

13.     Pursuant to Bankruptcy Code sections 105(a) and 1112(b), APTIM respectfully request entry of an Order converting these Chapter 11 cases to Chapter 7 cases for cause.[7]

## JURISDICTION AND VENUE

14.     This Motion to Convert is brought pursuant to 11 U.S.C. §§ 105(a) and 1112(b). This Court has jurisdiction over the subject matter of this Motion to Convert pursuant to 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

---

[6]     *See, e.g.*, 11 U.S.C. § 363(k) (right to credit bid); Fed. R. Bankr. P. 9014 (making Bankruptcy Rule 7014 applicable to contested matters); Fed. R. Bankr. P. 7041 (regarding withdrawal of contested matters); BLR 4002-1(a) ("A debtor in possession is responsible for strict compliance with the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and standing orders."); BLR 4002-1(b) (requiring that debtor "must strictly comply with court orders and Bankruptcy Code §§ 363 and 1107").

[7]     Section 1112(b) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter . . . for cause." 11 U.S.C. 1112(b)(1).  APTIM has requested conversion of the Chapter 11 Cases.

## EMERGENCY CONSIDERATION

15.    APTIM respectfully requests emergency consideration of the Motion to Convert. Emergency exists in that, as discussed below, the Debtors intend to run an expedited sales process, without preserving APTIM's right to credit bid and without Court-approved Bidding Procedures.  Moreover, by the Debtors' own admission, every day that this process proceeds results in diminution to the Debtors' estates and harm to the Debtors' creditors.   APTIM respectfully requests that the Motion to Convert be heard at the hearing scheduled July 16, 2020.

## RELEVANT BACKGROUND[8]

16.    On June 19, 2020, the Debtors filed the Chapter 11 Cases in the United States District Court for the Southern District of Texas.

17.    The Debtors have continued in the management and operations of their business and properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been appointed in these cases as of the date hereof.

18.    APTIM is the largest creditor of Juniper, holding a statutory lien claim of almost $39 million, which is secured by a lien on substantially all of the assets owned by Juniper.

19.    Juniper is the owner of immovable property and improvements thereon located in Westlake, Louisiana (the "Plant").   Juniper, as owner, contracted with APTIM, as general contractor, under a construction contract, dated February 2, 2018 (the "Contract"), wherein APTIM agreed to construct and complete the Plant.  APTIM performed in accordance with the Contract and Juniper paid all of APTIM's invoices, in full except for retainage, through the invoice dated March 29, 2019.

---

[8]    Other background information related to the Contract, Juniper's nonpayment, APTIM's statutory lien, the Arbitration Proceeding, and the stayed state court proceeding between APTIM and Juniper are set forth in the Omnibus Objection.

20.     APTIM has not been paid on any invoices issued after March 29, 2019.  APTIM is currently owed at least $38,872,988.71 (the "APTIM Claim").  As a general contractor, the APTIM Claim is secured by a "privilege" on Juniper's property pursuant to the Louisiana Private Works Act (La. R.S. 9:4801, *et seq.*) that was filed in the mortgage records of Calcasieu Parish, Louisiana. APTIM has filed a proof of claim in relation to the APTIM Claim, which is listed as Claim Number 1 on the Debtors' claims register.

21.     On September 12, 2019, APTIM initiated an arbitration proceeding with the American Arbitration Association against Juniper in accordance with the terms of the Contract (the "Arbitration Proceeding").  Over the past nine months, APTIM and Juniper have continued the Arbitration Proceeding.  June 19, 2020 was the deadline in the Arbitration Proceeding by which Juniper was required to produce all documents related to any claims in the Arbitration Proceeding.  The morning of June 18, 2020, Juniper's CRO relayed to APTIM's counsel that Juniper was "not in a position to fully comply" with the discovery deadline in the Arbitration Proceeding.

22.     In the meantime, Debtors engaged Jefferies LLC in prepetition efforts to assist with locating additional financing or capital to complete the Plant.  APTIM understands that the Debtors estimate that $200 million of additional capital is necessary to complete the project. Upon information and belief, the Debtors commenced the Chapter 11 Cases with just over $700,000 in cash, after having run an unsuccessful prepetition marketing process to raise additional capital and/or sell the Plant.  To date, despite the allegedly extensive sales process, Juniper has not identified a stalking horse bidder for any of its assets.

23.     At the first-day hearing on June 25, 2020, the Debtors sought entry of four substantive motions: a Cash Management Motion, an Insurance Motion, a Utilities Motion, and

the sale Motion.  The Court granted two substantive motions (the Cash Management Motion and the Utilities Motion) and adjourned the hearing on the sale Motion pending determination of the amount of the APTIM Claim that APTIM could credit bid at an auction of its collateral. (*See* Tr. First-Day Hr'g 8:11–13 ("And if the debtor wants a quick sale, it seems to me that [APTIM] and the debtor ought to be able to work out a way that [APTIM] can credit bid.").)

24.     As this Court observed, the Bidding Procedures filed with the Motion did not contemplate allowing secured creditors a right to credit bid. As the Debtors stated in the Motion, and as the Debtors' CRO testified, providing clear guidelines to potential bidders is a fundamental role of bidding procedures, and this clarity encourages parties to participate in the bidding process.

25.     In lieu of pursuing Court approval of its Bidding Procedures, on July 5, 2020, the Debtors purported to withdraw the Motion. Later that day, the Debtors' CRO testified that the Debtors intend to continue to market their assets on a timeline that is "consistent" with the timeline set forth in the Motion, but without any Court-approved bidding procedures that can be enforced by the Court or other parties in interest.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

26.     Section 1112(b) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing, the court ***shall*** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter . . . for cause."  11 U.S.C. § 1112(b)(1) (emphasis added). "Cause" is not exhaustively defined in section 1112(b) "so as to afford flexibility to the bankruptcy courts."  *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986).  However, the statutory bases for conversion or dismissal expressly include a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of

10

rehabilitation." *See* 11 U.S.C. § 1112(b)(4)(A). It is also well accepted that filing a Chapter 11 petition in bad faith constitutes cause for purposes of section 1112(b). *See In re Little Creek*, 779 F.2d at 1071–72 ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings. . . . Numerous cases have found a lack of good faith to constitute 'cause'. . . .").

### A.   Cause to Convert the Chapter 11 Cases Exists Under Section 1112(b)(4)(A).

27.   To demonstrate "cause" pursuant to section 1112(b)(4)(A), the movant must demonstrate (1) a substantial or continuing loss to or diminution of the debtor's estate and (2) the absence of a reasonable likelihood of rehabilitation. *See In re Creekside Senior Apartments, L.P.*, 489 B.R. 51, 61 (6th Cir. BAP 2013). Once the movant establishes cause, "the burden shifts to the Debtor to prove it falls within the § 1112(b)(2) 'unusual circumstances' exception to § 1112(b)(1)'s mandatory conversion." *In re Gateway Access Sols., Inc.*, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007). The Debtors have, by their own admission, abandoned all hope of a reorganizing or rehabilitating, instead seeking (in a period of 50 days) to sell all of their assets in a rushed process, which the Debtors themselves acknowledge is causing significant diminution to their estates. (*See* Mot. ¶ 2.)

### i.   There is a Substantial and Continuing Loss to or Diminution of the Debtors' Estates.

28.   A loss is "substantial" for purposes of section 1112(b)(4)(A) if it "is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors." *In re Israel Sand, LLC*, 569 B.R. 433, 440 (Bankr. S.D. Tex. 2017). "Negative cash flow and an inability to pay current expenses as they come due can satisfy the continuing loss or diminution of the estate standard for purposes of § 1112(b)." *In*

11

*re Gateway Access Sols.*, 374 B.R. at 564; *accord In re Israel Sand*, 569 B.R. at 440; *In re Miell*, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009).

29.     Currently, the Debtors are experiencing significant negative cash flow.   The Debtors had no revenue in 2019.[9]   The Debtors have admitted that they will run out of money by August 31, 2020 and that, for this reason, the entire sale process must be completed prior to that date.  (*See* Tr. First-Day Hr'g 12:3–4 ("August 31 is a hard stop for us.   Under no conditions can we push [closing] past August 31.").)   Additionally, the Debtors have failed to identify how they will pay expenses that are vital to their business operations as they come due.   For example, the Debtors will have to pay an insurance premium due on the Plant at the end of August.   This premium was approximately $700,000 last year.  (*See* Insurance Mot. ¶ 15.)   Despite recognizing the necessity of insurance given that the Debtors' business operations include the use of hazardous materials, the Debtors have failed to identify how they could pay the insurance premium when it comes due.  (*See* Tr. First-Day Hr'g 15:21–24)

30.     The Debtors proposed an unrealistic and prejudicial sales process, which was adjourned.   Debtors' own papers suggest significant concerns regarding their ability to pay their administrative expenses.  (*See* Mot. ¶ 2.)   Yet despite concerns regarding their ability to pay their administrative expenses, the Debtors submitted an application to retain Jefferies and provide the following compensation:

- A monthly fee of $75,000 payable in advance;
- A Restructuring Fee of $2.5 million, subject to certain potential credits;
- An M&A Fee equal to the greater of (i) $1.5 million and (ii) 3% of Transaction Value payable even if the only "Transaction" is a credit bid; ***and***
- A 3% Financing Fee.  (*See* Jefferies Retention Application ¶ 23 [Docket No. 54].)

---

[9]     Of course, that did not stop the Debtors from making millions of dollars of transfers to admitted insiders.

31.     By the Debtors' own admission, since COVID-19 reached the United States, interest in its assets has "dissipated quickly." (*See id.* ¶ 9.) The Debtors have given no indication why they expect that they can close on a sale of sufficient value to pay expected administrative expenses if these Chapter 11 Cases remain in Chapter 11.

32.     This sort of financial engineering is evidence of why the Chapter 11 Cases should be converted to cases under Chapter 7. The Debtors simply have no money to fund the Chapter 11 Cases in a manner that would foster a reasonable sale or reorganization process. Instead, they have proposed an expedited and uncertain fire sale process for a complicated and expensive set of assets, and they are asking prospective bidders to foot the bill for their administrative expenses.

33.     Indeed, the Bankruptcy Local Rules indicate that this type of financial engineering at the expense of creditors violates the duties of a debtor in possession. APTIM submits that the Debtors' actions in these cases contravene the following requirements of Bankruptcy Local Rule 4002-1:

- "(b) . . . The debtor must prevent the depletion of the assets of the business during the proceedings, and it must notify its counsel immediately of a depletion or potential depletion."

- "(f) The debtor must not incur administrative and priority expenses unless funds are reasonably expected to be generated to pay them."

**ii.      The Debtors Have No Reasonable Likelihood of Rehabilitation.**

34.     Reasonable likelihood of rehabilitation turns on "whether the debtor's business prospects justify continuance of the reorganization effort [and] . . . [r]ehabilitation means to reestablish a business." *In re Israel Sand*, 569 B.R. at 441 (alterations and omission in original) (quoting 7 COLLIER ON BANKRUPTCY ¶ 1112.04(6)(a)(ii) (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2017).

35.     The record in these Chapter 11 Cases clearly shows that no reasonable likelihood of rehabilitation exists.  The lack of evidence of a source of financing demonstrates that the Debtors have no reasonable likelihood of rehabilitation.  *See In re Israel Sand*, 569 B.R. at 442 (considering lack of identified financing as a reason for its finding that no reasonable likelihood of rehabilitation existed).  The Debtors have no proposed DIP financing, and, notwithstanding their desire to separately split their assets into different "Asset Classes" in their proposed sale process, have failed to identify a stalking horse bid for any asset on terms acceptable to the Debtors.  Most tellingly, the Debtors appear to have, from the outset of these Chapter 11 Cases, cast aside any possibility of a rehabilitation or reorganization.  The Debtors have not made any mention of any desire to develop or solicit a plan in these Chapter 11 Cases (indeed, based on the Debtors' liquidity position, they are likely financially unable to do so), instead opting to seek approval of procedures for a fire sale of their assets at the first-day hearing.

36.     Additionally, the Debtors' requested relief to date confirms that they have very few (if any) real operations.  No motions have been filed to pay critical trade vendors or suppliers.  The Debtors have admitted that they have very few (if any) employees, and no motion has been filed to pay employee claims.  (*See* First Day Decl. ¶ 14.)  There has been no motion filed to pay taxes or any other operating liabilities.  It is clear from the record that the Debtors have no business to rehabilitate and no assets around which to restructure.  The relief the Debtors have requested to date (seeking such payments as absolutely necessary to preserve minimal remaining assets and requested approval for a fire sale with no stalking horse) could be (and frequently is) approved in a Chapter 7 bankruptcy.

37.     By their own admission, the Debtors are experiencing substantial or continuing loss to and diminution of their estates and have no reasonable likelihood of rehabilitation.  Thus,

14

cause exists under section 1112(b)(4)(A) to convert the Chapter 11 Cases to cases under Chapter

7. Such conversion would be in the best interest of creditors.

**B.** **Cause Exists to Convert the Chapter 11 Cases to Cases Under Chapter 7 Because the Chapter 11 Cases Were Filed in Bad Faith and the Debtors in Possession Have Operated in Bad Faith Since.**

38.     Filing a Chapter 11 petition in bad faith constitutes cause under section 1112(b).

*See, e.g.*, *In re Elmwood Dev. Co.*, 964 F.2d 508, 510 (5th Cir. 1992).  The purpose of the good

faith requirement is to "preven[t] abuse of the bankruptcy process by debtors whose overriding

motive is to delay creditors without benefitting them in any way or to achieve reprehensible

purposes." *In re Little Creek*, 779 F.2d at 1072.[10]

39.     In *Little Creek*, the Fifth Circuit recognized that a finding of bad faith requires a

case-by-case analysis of multiple factors, with no single factor being dispositive.  *See id.*

("Determining whether the debtor's filing for relief is in good faith depends largely upon the

bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the

local financial realities. Findings of lack of good faith in proceedings based on . . . 1112(b) have

been predicated on certain recurring but non-exclusive patterns, and they are based on a

conglomerate of factors rather than on any single datum.").   Nonetheless, the Fifth Circuit

recognized that "[s]everal, but not all, of the following conditions usually exist" when a petition

was filed in bad faith:

---

[10]    Although the Fifth Circuit in *Little Creek* considered a motion to lift stay rather than a motion under section 1112(b), the Fifth Circuit has applied *Little Creek* to cases considering conversion for cause under section 1112(b).  *See In re Elmwood Dev. Co.*, 964 F.2d at 510 (citing *Little Creek* and affirming dismissal of Chapter 11 case for cause because it was filed in bad faith); *see also In re McMahan*, 481 B.R. 901, 916 n.10 (Bankr. S.D. Tex. 2012) ("While *Little Creek* concerned a motion to lift stay, as opposed to a motion to dismiss, the good faith analysis articulated in *Little Creek* logically applies to a motion to dismiss as well. In fact, *Elmwood*, which analyzed the bankruptcy court's decision to dismiss, cites extensively to *Little Creek*.").  Additionally, *Little Creek* itself recognized that "cause" under section 362(d) and section 1112(b) are analogous.  *See In re Little Creek*, 779 F.2d at 1072 ("Litigation concerning good faith which is pertinent to this case has arisen under § 362(d) of the Bankruptcy Code, 11 U.S.C. § 362(d)(1), governing relief from the automatic stay, and under 11 U.S.C. § 1112(b), which permits dismissal or conversion of a reorganization case.").

The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. . . .

*Id.* at 1072–73.[11]

40.     In *Little Creek*, the Fifth Circuit further recognized that under the articulated circumstances, a debtor's "[r]esort to the protection of the bankruptcy laws is not proper . . . because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'"  *Id.* at 1073. "Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions." *Id.*

41.     Here, almost all (if not all) of the conditions recognized by the Fifth Circuit in *Little Creek* as evidence of a bad faith filing exist.

- The Plant (and other attendant assets) are effectively the Juniper Debtor's only assets.[12]

---

[11]   Courts in the Fifth Circuit continue to cite and apply the *Little Creek* factors when considering motions under section 1112(b). *See, e.g., In re Baribeau*, 603 B.R. 797, 804 (W.D. Tex. 2019) (denying debtor's motion to reconsider bankruptcy court's conversion from case under Chapter 11 to a case under Chapter 7 because "the Court addressed all of the factors discussed in *In re Little Creek* and weighed the totality of the circumstances when it decided to convert the case"); *In re Triumph Christian Ctr., Inc.*, 493 B.R. 479, 494–95 (Bankr. S.D. Tex. 2013) (applying the *Little Creek* factors and concluding that "the presence of five of the six *Little Creek* factors is evidence that the Debtor filed the Second Case in bad faith"); *In re Morgan*, No. 01-50250-11, 2001 Bankr. LEXIS 2254, at * 8 (Bankr. N.D. Tex. June 18, 2001) (dismissing case for cause after citing *Little Creek* factors).

[12]   Although *Little Creek* was a single asset bankruptcy, when a debtor has more than one asset, this factor still leans in favor of a finding of bad faith when the value of the property beyond the single largest asset is comparatively small. *See In re Triumph Christian Ctr., Inc.*, 493 B.R. at 494 (finding that the "one asset" factor leaned in favor of a finding of bad faith because the value of the debtor's remaining assets compared to the value of the debtor's main asset was "relatively small").

- APTIM's almost $39 million statutory lien encumbers all of Juniper's immovable property, including the Plant.
- "Since August 1, 2019, neither SGCE nor Juniper have any employees.  SGCE has no paid personnel and Juniper currently has very limited personnel."  (First Day Decl. ¶ 14.)
- As discussed *supra*, the Debtors have little or no cash flow and no available sources of income to sustain a plan of reorganization.  (*See supra* ¶¶ 25–34.)
- The Debtors have no hope of rehabilitation, "except according to the debtor's 'terminal euphoria.'"  *Little Creek*, 779 F.2d at 1073.
- Although Juniper has not yet lost in the Arbitration Proceeding and the Plant has not yet been posted for foreclosure, both conditions were likely to occur absent the bankruptcy filing.  The Debtors cited management of litigation and arbitration costs cited as reason for filing for bankruptcy.  (First Day Decl. ¶ 15.)

42.     Additionally, as discussed below, courts have found cause under section 1112(b) in two factual scenarios present here: (1) when the case is filed as a litigation tactic and (2) when the case presents effectively a two-party dispute.

> **i.      The Chapter 11 Cases Were Filed as a Litigation Tactic to Avoid Producing Discovery in the Arbitration Proceeding.**

43.     Cause for conversion exists under section 1112(b) when bankruptcy petitions were filed to gain an unfair litigation advantage or in an attempt to circumvent the jurisdiction of another forum.  *See In re Marino*, No. 09-33545-H3-11, 2010 WL 519772, at *5 (Bankr. S.D. Tex. Feb. 9, 2010) (finding that Chapter 11 case was filed in bad faith); *see also In re Stingfree Techs. Co.*, 427 B.R. 337, 353–54 (E.D. Pa. 2010) (affirming bankruptcy court's finding of cause under section 1112(b) when (1) debtor filed Chapter 11 petition on the eve of an important hearing in pending state court litigation, (2) debtor had no current operations and virtually no employees, and (3) debtor proposed to sell its assets, with little or no marketing); *In re Blunt*, 236 B.R. 861, 865 (Bankr. M.D. Fla. 1999) (converting Chapter 11 case to Chapter 7 for cause after finding that filing on the eve of foreclosure was an "intent to delay or frustrate the legitimate efforts by [secured creditors to enforce their] rights").  Here, the facts are strikingly similar to *In re Stingfree*.  The Debtors (1) filed their petition the same day as an important discovery deadline

in the Arbitration Proceeding, (2) have no current operations and have virtually no employees (*see* First Day Decl. ¶ 14.), and (3) have proposed an expedited and uncertain sale process for their assets.

44.     The Debtors filed the Chapter 11 Cases, APTIM believes, in an attempt to avoid a pending discovery deadline in the Arbitration Proceeding.   June 19, 2020 was Juniper's discovery deadline in the Arbitration Proceeding.   APTIM believes that if Juniper had complied with this deadline, APTIM would have gained meaningful evidence regarding the validity of APTIM's claims and the lack of merit to Juniper's counterclaims.   That belief has since been borne out in discovery, where the Debtors produced their own books and records showing the APTIM Claim in the full amount.

45.     Since the Petition Date, as set forth herein and in APTIM's Supplemental Objection, the gamesmanship has worsened and is cause to convert the Chapter 11 Cases to cases under Chapter 7.

### ii.       The Chapter 11 Cases Present a Two-Party Dispute.

46.     Bankruptcy courts in this District have "generally found cause [under section 1112(b) when] . . . it appeared that the debtor was attempting to use the provisions of the Bankruptcy Code to gain an unfair advantage in a two party dispute."   *In re Marino*, 2010 WL 519772, at *3 (dismissing Chapter 11 cases for cause because the cases arose out of an ongoing state court dispute regarding control, ownership, and operation of the corporations); *see also In re Triumph Christian Ctr., Inc.*, 493 B.R. at 495 (finding that a Chapter 11 case presented a two-party dispute because the debtor's largest secured creditor held a lien on the debtor's most valuable asset); *In re Starmark Clinics, LP*, 388 B.R. 729, 736–37 (Bankr. S.D. Tex. 2008) (finding Chapter 11 case presented a two-party dispute because (1) there was a pending state court proceeding; (2) there were few creditors scheduled, other than participants in the state court

case; and (3) the amounts in controversy in the state court case vastly exceeded the size of the assets and gross income of the bankruptcy estate and dismissing the Chapter 11 case was in the best interests of creditors because of the large administrative costs associated with continuing under Chapter 11).

47.     The Chapter 11 Cases are essentially a two-party dispute.  The APTIM Claim is by far the largest claim against Juniper.  The two-party nature of this case is also evident from the fact that the Debtors filed their petition on the same day as an important discovery deadline in the Arbitration Proceeding.

48.     APTIM and Juniper have been litigating the APTIM Claim for nine months. Managing these litigation costs is a cited reason for the Debtors' bankruptcy filing.  (*See* First Day Decl. ¶ 15.)  The Debtors primarily seek to use the bankruptcy process to determine disposition of the Plant.  This requires determining the APTIM Claim, a process that was proceeding outside of bankruptcy court.

49.     Now that the Debtors have chosen to resolve the APTIM Claim and the disposition of the Plant in bankruptcy court, APTIM—Juniper's largest creditor—supports doing so through Chapter 7.  Doing so will resolve the APTIM Claim more economically than through Chapter 11.

**C.     Cause Exists So That a Chapter 7 Trustee Can Investigate and Pursue Potentially Valuable Causes of Action Against Insiders.**

50.     In addition to the foregoing examples of bad faith, conversion to Chapter 7 is appropriate based on gross mismanagement by the Debtors' principals. *See* 11 U.S.C. § 1112(b)(4)(B) (listing gross mismanagement as an example of cause for conversion).   In evaluating whether gross mismanagement is present, courts consider "the overall management of the debtor, both past and present; the trustworthiness of the debtor's management; the nature of

and availability of financial records; the movement of funds between the debtor and related entities; the ability of management to act as a fiduciary for the estate; and pragmatic considerations such as cost." *See In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 617 (Bankr. D. Wyo. 1995) (citing *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (discussing "gross mismanagement" as an example of "cause" necessitating appointment of Chapter 11 trustee).

51.     The Debtors have engaged in gross mismanagement, both before and after the Petition Date. As noted above, the numerous unexplained transfers to insiders, as evidenced by the Schedules filed in this case  evidence a pattern of gross mismanagement. The Debtors' principals appear to be siphoning off millions of dollars from a ***non-operating*** Debtor for the benefit of insiders.  Only an independent Chapter 7 trustee will be in a position to evaluate the relationships and transactions between the Debtor and its non-Debtor insider affiliates; evaluate and pursue avoidance actions against insiders, to the extent appropriate; and make decisions regarding satisfaction of the APTIM Claim and the liquidation of the Debtors.

## CONCLUSION

52.     In short, almost all of the conditions recognized by the Fifth Circuit in *Little Creek* as evidence of bad faith exist here.  Additionally, there is evidence that the Debtors filed the cases as a litigation tactic to avoid producing discovery in the Arbitration Proceeding.  Next, the cases present effectively a two-party dispute.  Finally, Debtors have engaged in gross mismanagement, both before and after the Petition Date, having transferring millions of dollars to insiders.  Thus, cause exists under section 1112(b) to convert the Chapter 11 Cases to cases under Chapter 7.

**REQUESTED RELIEF**

53.     For these reasons, APTIM respectfully requests that this Court convert these Chapter 11 Cases to Chapter 7.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE, APTIM respectfully requests that the Court (i) grant the Motion to Convert and (ii) grant such other and further relief as may be just and proper.

Dated:  July 6, 2020

Respectfully submitted,

**PHELPS DUNBAR LLP**

_/s/ Rick M. Shelby_
Patrick "Rick" M. Shelby (La. Bar No. 31963)
Danielle Mashburn-Myrick
(_Admitted pro hac vice_)
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130
rick.shelby@phelps.com
danielle.mashburn-myrick@phelps.com

-and-

Ron E. Meisler
(_Admitted pro hac vice_)
Carl T. Tullson
(_Admitted pro hac vice_)
Amy Van Gelder
(_Admitted pro hac vice_)
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Facsimile:  (302) 651-3001
Email:Carl.Tullson@skadden.com

**COUNSEL FOR APTIM MAINTENANCE, LLC**

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2020, a true and correct copy of the foregoing Objection was served electronically via the Court's CMECF system.

*/s/ Rick M. Shelby*